[No. 76629-1.  En Banc.]
Argued May 19, 2005.    Decided July 28, 2005.

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
IN
THE UNITED STATES OF AMERICA ET AL., *Plaintiffs*, v. LINDA
HOFFMAN, *as Director of the Department of
Ecology*, ET AL., *Defendants*.

732

*Cynthia J. Morris, Kenneth C. Amaditz,* and *David Kaplan* (of the *United States Department of Justice*); *Stephen A. Smith* and *Matthew J. Segal* (of *Preston Gates & Ellis, L.L.P.*); *Stephen B. Cherry* (of *Fluor Hanford, Inc.*);

*Michael J. Zevenbergen*; and *William H. Beatty* (of the *United States Attorney's Office*) (*James R. Spaanstra, Jessica F. Toll*, and *Lynn M. Kornfeld* of *Faegre & Benson*, of counsel), for plaintiffs.

*Robert M. McKenna, Attorney General, Laura J. Watson, Section Chief, Elliott S. Furst, Senior Counsel*, and *Joseph E. Shorin III* and *Andrew A. Fitz, Assistants*; and *Michael J. Robinson-Dorn*, for defendants.

*Kristopher I. Tefft* on behalf of Association of Washington Business, Members of the Washington State Legislature, and Tri-City Area Chamber of Commerce, amici curiae.

¶1 OWENS, J. — This case involves five questions of law related to Washington Initiative Measure No. 297 (I-297),[1] now known as the Cleanup Priority Act (CPA), chapter 70.105E RCW. These questions were certified to this court by the United States District Court for the Eastern District of Washington.

## FACTS

¶2 The CPA was passed as I-297 in the November 2004 election and became part of a complex state and federal system for regulating materials that are variously described as hazardous, dangerous, radioactive, or having some combination of these attributes. The CPA contains several distinct provisions but, as a general matter, was drafted to prevent the addition of new radioactive and hazardous waste to the Hanford nuclear reservation until the cleanup of existing contamination is complete. *See* RCW 70.105E.010 (stating the purpose of the CPA). Before any section of the CPA could be implemented by the State of

---

[1] LAWS OF 2005, ch. 1.

Washington Department of Ecology (Ecology), the United States sought and obtained a temporary restraining order in the United States District Court.[2]

¶3 As the federal case progressed, the United States sought an order of summary judgment that the CPA's provisions violate the United States Constitution's supremacy clause (article VI, clause 2) and commerce clause (article I, section 8, clause 3) and extend beyond any waiver of sovereign immunity. In opposing the summary judgment motion, Ecology argued that statutory interpretation of the CPA by this court would narrow or eliminate many of the United States' claims. To this end, Ecology moved to certify five questions (the first of which having four subparts) for an opinion. Judge Alan A. McDonald granted the motion, and we accepted review of the questions as certified.[3]

## CERTIFIED QUESTIONS

1. What materials are encompassed within the definition of "mixed waste" set forth in Section 3(9) of the CPA [RCW 70.105E.030(9)]?

(a) Specifically, does the definition of "mixed waste" encompass materials that consist solely of radioactive source, special nuclear, or byproduct materials and, if so, under what circumstances does the CPA apply to such materials?

(b) Specifically, does the definition of "mixed waste" encompass materials that are mixtures of radioactive source, special nuclear, or byproduct materials and other hazardous substances that do no[t] designate as "dangerous waste" under state laws? If so, under what circumstances does the CPA apply to such materials?

---

[2] Three parties intervened in the federal litigation. Joining the United States, Fluor Hanford, Inc. (Fluor) and Tri-City Industrial Development Council (TRIDEC) have intervened as plaintiffs. Fluor is a major private contractor operating at Hanford and TRIDEC represents 364 local businesses, public entities, and professional organizations in the Tri-Cities region (including Fluor). Intervening as a defendant is Yes on I-297: Protect Washington et al. (CPA Sponsors), who drafted and promoted I-297.

[3] CPA Sponsors move to strike portions of the amicus brief submitted by the Association of Washington Business (AWB). While the disputed portions of AWB's brief are not germane to this opinion, CPA Sponsors are correct that much of the amicus brief fails to comply with RAP 10.3 and 10.6. The motion to strike is granted.

(c) Specifically, does the definition of "mixed waste" encompass materials that are not "solid wastes" under the Resource Conservation and Recovery Act (RCRA) and, if so, under what circumstances does the CPA apply to such materials?

(d) In light of the Court's answers to subparts (a) through (c), above, does the definition of "mixed waste" expand the scope of materials regulated as mixed waste under the Washington Hazardous Waste Management Act (HWMA) and RCRA?

2. Does the operation of the CPA prevent the intra-site transfer of waste among various units at a site or facility?

3. How does the exemption in Section 8 of the CPA [RCW 70.105E.080] affect the application of the CPA to United States naval facilities?

4. Does section 6(1)(a)(ii) of the CPA [RCW 70.105E.060(1)-(a)(ii)], which requires development of an inventory of hazardous substances potentially disposed to unlined trenches based on "actual characterization["] of such substances, require the physical inspection of each and every material disposed?

5. If the federal court finds that certain provisions of the CPA are unconstitutional, are the remaining provisions of the statute severable?

Certification to Wash. State Supreme Court (Feb. 8, 2005) at 2-3.

## STANDARD OF REVIEW

■ ¶4 RAP 16.16 allows this court to determine questions of law certified by a federal court if the question is one of state law that has "not been clearly determined and does not involve a question determined by reference to the United States Constitution." RAP 16.16(a). Whether to actually answer a certified question that has been accepted for review is within the discretion of this court. *See id.; Hoffman v. Regence Blue Shield*, 140 Wn.2d 121, 128, 991 P.2d 77 (2000). We have declined to answer a certified question where the record before us was insufficient and any attempt to answer would be "improvident." *Id.*

¶5 Questions 1-4 require statutory interpretation of the CPA. Statutory interpretation is a question of law that is reviewed de novo. *See W. Telepage, Inc. v. City of Tacoma Dep't of Fin.*, 140 Wn.2d 599, 607, 998 P.2d 884 (2000). "Where statutory language is plain and unambiguous, courts will not construe the statute but will glean the legislative intent from the words of the statute itself, regardless of contrary interpretation by an administrative agency." *Agrilink Foods, Inc. v. Dep't of Revenue*, 153 Wn.2d 392, 396, 103 P.3d 1226 (2005). "A statute is ambiguous if 'susceptible to two or more reasonable interpretations,' but 'a statute is not ambiguous merely because different interpretations are conceivable.' " *Id. (quoting State v. Hahn*, 83 Wn. App. 825, 831, 924 P.2d 392 (1996)).

## ANALYSIS

1. What materials are encompassed within the definition of "mixed waste" set forth in RCW 70.105E.030(9)?

¶6 Clearly, we cannot provide a complete answer to this general statement of the question. Creating a comprehensive list of *every* material encompassed within the CPA definition of "mixed waste" would be impossible. Given the specificity of the subparts, it appears that this portion of the question is not intended to be answered as phrased; the parties themselves forgo any attempt to do so. Subparts (a)-(c) narrow the scope of the question to specific definitional disputes. Subpart (d) appears to simply require a summation of the conclusions in subparts (a)-(c). Accordingly, we confine our answers to determining whether the CPA definition of "mixed waste" expands the scope of regulated materials beyond the Hazardous Waste Management Act (HWMA), chapter 70.105 RCW and the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6901-6992k.

a. Specifically, does the definition of "mixed waste" encompass materials that consist solely of radioactive source, special nuclear, or byproduct materials and, if so, under what circumstances does the CPA apply to such materials?

■ ¶7 The parties uniformly agree that the answer to this question is, no. For a material to qualify as "mixed waste" under the CPA definition, it must have both a nonradioactive component and a radioactive component. *See* RCW 70.105E.030(9). Materials that consist *solely* of radioactive source, special nuclear, or byproduct materials are outside the scope of this definition.

b. Specifically, does the definition of "mixed waste" encompass materials that are mixtures of radioactive source, special nuclear, or byproduct materials and other hazardous substances that do not designate as "dangerous waste" under state laws? If so, under what circumstances does the CPA apply to such materials?

■ ¶8 For a material to "designate" as dangerous waste, it must either be specifically listed as a dangerous waste under WAC 173-303-081 through -082, exhibit one of four characteristics (ignitability, corrosivity, reactivity, or toxicity) under WAC 173-303-090(5)-(8), or meet the criteria of toxicity or persistence under WAC 173-303-100(1). The United States argues that the plain language of the CPA's "mixed waste" definition includes, as a matter of law, materials that do not "designate" as dangerous waste. In response, Ecology invites us to ignore the defined terms incorporated within the CPA in favor of a far narrower interpretation of "mixed waste." For the reasons that follow, we decline Ecology's invitation.

¶9 The United States' position is relatively simple: there is an unbroken chain of cross-references from the CPA definition of "mixed waste" to the expansive definition of "hazardous substances" in RCW 70.105.010(14). In turn, RCW 70.105.010(14) incorporates materials that do not "designate" as dangerous waste under the HWMA. These

definitional cross-references in the CPA relate to one another as follows:

> "Mixed waste" or "mixed radioactive and hazardous waste" means *any hazardous substance* or dangerous or extremely hazardous waste that contains both a nonradioactive hazardous component and a radioactive component, including any such substances that have been released to the environment, or pose a threat of future release, in a manner that may expose persons or the environment to either the nonradioactive or radioactive hazardous substances.

RCW 70.105E.030(9) (emphasis added).

> "Hazardous substance" has the same meaning as the term is defined *in RCW 70.105D.020.*

RCW 70.105E.030(6) (emphasis added).

¶10 Under RCW 70.105D.020(7):

> "Hazardous substance" means:
>
> (a) Any dangerous or extremely hazardous waste as defined in RCW 70.105.010(5) and (6), or any dangerous or extremely dangerous waste designated by rule pursuant to chapter 70.105 RCW;
>
> (b) *Any hazardous substance as* defined *in RCW 70.105.010(14)* or any hazardous substance as defined by rule pursuant to chapter 70.105 RCW;
>
> (c) Any substance that, on March 1, 1989, is a hazardous substance under section 101(14) of the federal cleanup law, 42 U.S.C. Sec. 9601 (14);
>
> (d) Petroleum or petroleum products; and
>
> (e) Any substance or category of substances, including solid waste decomposition products, determined by the director by rule to present a threat to human health or the environment if released into the environment.

(Emphasis added.)

¶11 Under RCW 70.105.010(14):

> "Hazardous substances" means any liquid, solid, gas, or sludge, including any material, substance, product, commodity, or waste, *regardless of quantity*, that exhibits any of the charac-

teristics or criteria of hazardous waste as described in rules adopted under this chapter.

(Emphasis added.)

¶12 The United States notes that the definition of "hazardous substances" in RCW 70.105.010(14) includes the language "regardless of quantity." In contrast, the HWMA includes threshold quantity requirements for certain materials to "designate" as dangerous waste. *See* WAC 173-303--090(8)(a)-(c). Thus, a given material could qualify as "mixed waste" under the CPA (via its status as a hazardous substance under RCW 70.105.010(14)), while that same material could not, as a matter of law, otherwise "designate" as dangerous waste under the HWMA.

¶13 Ecology's interpretation of this statutory regulation is significantly more complicated. Essentially, Ecology asks us to ignore the direct cross-references incorporating the expansive definition of "hazardous substances" in RCW 70.105.010(14). Instead, Ecology suggests that we "construe the [CPA's] reference to 'hazardous substances' in conjunction with the language of the definition and the CPA as a whole." Def. State of Washington's Reply Br. at 10. Ecology maintains that, in spite of the unequivocal definitions discussed above, the CPA refers *only* to those "hazardous substances" that have been released or pose a threat of future release to the environment.[4] Under applicable regulations, materials that have been released or pose a threat of future release will automatically "designate" as dangerous waste. *See* WAC 173-303-016(1)(b)(ii), (3)-(4). Thus, if Ecology were correct that the CPA's reference to "hazardous substances" is *necessarily* limited to only those materials

---

[4] Notably, the CPA definition of "mixed waste" refers to "any hazardous substance . . . *including* any such substances that have been released to the environment, or pose a threat of future release." RCW 70.105E.030(9) (emphasis added). The word "including" is a term of enlargement, not limitation. In this context, "including" must mean that the definition encompasses *both* materials that have been released or pose a threat of future release *and* others that do not. Therefore, the plain language of RCW 70.105E.030(9) flatly contradicts Ecology's argument that the CPA is limited to *only* those "hazardous substances" that have been released or pose a threat of release.

that have been released or pose a threat of release, the CPA would be coextensive with the HWMA and the RCRA.

¶14 Ecology raises several related arguments in support of its narrow reading of the CPA's reference to "hazardous substances." First, Ecology suggests that the term "mixed waste," where we find the disputed reference to "hazardous substance," is self-limiting. That is, Ecology contends, we should ignore the definition of a defined term of art ("mixed waste") in favor of the common usage meaning of "waste" and read out of the CPA any and all materials that have not been discarded. It is an axiom of statutory interpretation that where a term is defined we will use that definition. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813, 828 P.2d 549 (1992). Only where a term is undefined will it be given its plain and ordinary meaning. *See id.* "Mixed waste" and "hazardous substance" are both defined terms within the CPA. Thus, Ecology's contention that the word "waste" limits the application of otherwise clear and unequivocal statutory definitions to circumstances of "release or threatened release" is wholly without merit.[5] Second, Ecology argues that because the broad definitions of "hazardous substances" are found in state and federal cleanup regulations (Model Toxics Control Act, chapter 70.105D RCW; and Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675), the CPA's reference to hazardous substances must be limited to only those materials that have been released or pose a threat of release. This argument is similarly without merit. There is no requirement that the materials defined as "hazardous substances" under RCW 70.105D.020(7) be released or pose a threat of release. The CPA, which incorporates RCW 70.105D.020 by reference, is also devoid of any such a requirement.

---

[5] Ecology attempts to resurrect this same reasoning in two additional arguments, directing our attention to "waste" references found in both additional sections of the CPA and the voters pamphlet. It is no more availing on the second and third attempts. Simply put, the definitions of explicitly defined terms cannot be altered by an interpretation of undefined terms found in related sections of a statute or legislative history.

¶15 In sum, we are left with a choice between two alternatives. On the one hand, the United States suggests a plain language interpretation based on the statutory definitions of "mixed waste" and "hazardous substance." There is no dispute that, if these definitions are operative, the CPA includes some materials that do not "designate" as dangerous waste. On the other hand, Ecology asks us to artificially eliminate much of the substance of these definitions in a way that narrows the scope of "hazardous substance" to materials that have been released or pose a threat of release. Such an artificial limitation would require us to ignore long-held rules of statutory interpretation. Accordingly, the answer to question 1(b) is, yes, to the extent that a "hazardous substance," as defined in RCW 70.105.010(14), might fail to designate as dangerous waste because the concentration of dangerous material is insufficient.

c. Specifically, does the definition of "mixed waste" encompass materials that are not "solid wastes" under the RCRA and, if so, under what circumstances does the CPA apply to such materials?

¶16 Under the RCRA, "solid waste" is defined as:

> any *garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material*, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954.

42 U.S.C. § 6903(27) (emphasis added). *See also* 40 C.F.R. § 261.2 (further defining "solid waste"). As the phrase "and other discarded material" suggests, every material that qualifies as "solid waste" must be in some way "discarded."

The United States contends that the CPA's definition of "mixed waste" includes materials that do not fall within the RCRA definition of "solid waste." As described above, the CPA definition of "mixed waste" includes "hazardous substances"; "hazardous substances" has the same meaning as provided in RCW 70.105D.020(7); and RCW 70.105D.020(7) includes the following expansive definition:

"Hazardous substance" means:

(a) Any dangerous or extremely hazardous waste as defined in RCW 70.105.010(5) and (6), or any dangerous or extremely dangerous waste designated by rule pursuant to chapter 70.105 RCW;

(b) *Any hazardous substance as defined in RCW 70-.105.010(14)* or any hazardous substance as defined by rule pursuant to chapter 70.105 RCW;

(c) *Any substance that*, on March 1, 1989, *is a hazardous substance under section 101(14) of* [*CERCLA*], 42 U.S.C. Sec. 9601(14);

(d) *Petroleum or petroleum products*; and

(e) Any substance or category of substances, including solid waste decomposition products, determined by the director by rule to present a threat to human health or the environment if released into the environment.

(Emphasis added.)

¶17 The United States relies on RCW 70.105D.020(7)(b)--(d) to support its argument that the CPA includes materials that are not "solid waste" under the RCRA. First, under RCW 70.105D.020(7)(b), "hazardous substance" includes "any material, substance, product, commodity, or waste." *See* RCW 70.105.010(14). A "commodity" is not "discarded" and, therefore, not solid waste. Moreover, the items at issue (material, substance, product, commodity, or waste) are listed disjunctively, meaning the first four may be distinct from the last—waste. Second, RCW 70.105D.020(7)(c) adopts the CERCLA definition of "hazardous substances." The broad CERCLA definition of "hazardous substances" includes some materials that are not discarded under the RCRA. *See* 42 U.S.C. § 9601(14). Finally, RCW 70.105D.020(7)(d) references

petroleum and petroleum products, which may or may not be "discarded" (i.e., not necessarily solid waste).

¶18 Ecology agrees that a number of the materials incorporated by the RCW 70.105D.020(7)(b)-(d) definition of "hazardous substances" do not qualify as "solid waste." However, not to give up without a fight, Ecology again relies on those arguments discussed in subpart (b) above—that the CPA definition should be limited to hazardous substances that have been released or pose a threat of release. The arguments are no more persuasive the second time around. Consequently, we answer this question as follows: Yes, to the extent that a "hazardous substance," as defined in RCW 70.105D.020(7)(b)-(d), fails to qualify as a "solid waste" for lack of being "discarded" or otherwise abandoned, recycled, or inherently waste-like under 42 U.S.C. § 6903(27) and 40 C.F.R. § 261.2.

d. In light of the court's answers to subparts (a)-(c) above, does the definition of "mixed waste" expand the scope of materials regulated as mixed waste under the HWMA and the RCRA?

¶19 Under the foregoing analysis of subparts (a)-(c), the answer to this subpart of question 1 is, yes. Under subpart (a), the CPA definition of mixed waste does not apply to purely radioactive Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2297g, materials. However, the CPA encompasses materials that do not "designate" as dangerous waste through the cross-reference to RCW 70.105.010(14) and encompasses materials that are not "solid waste" through the cross-reference to RCW 70.105D.020(7)(b)-(d). Thus, the CPA does expand the scope of materials currently subject to regulation as mixed waste beyond the HWMA and the RCRA.

2. Does the operation of the CPA prevent the intrasite transfer of waste among various units at a site or facility?

¶20 Ecology maintains that the CPA does not prohibit the intrasite transfer of waste. In response, the United

States agrees that Ecology's interpretation is both permissible and preferable and, further, notes that while this issue was raised in the United States' motion for a temporary restraining order, it is not applicable to the summary judgment motion. The intervening plaintiffs either agree with the United States or offer no argument. Accordingly, there is no dispute that the answer to this question is, no.

3. How does the exemption in RCW 70.105E.080 affect the application of the CPA to United States naval facilities?

¶21 The CPA provides an exemption related to naval activities, which states as follows:

> Nothing in [this act] shall affect existing permits for, or in any manner prohibit, the storage or disposal of *sealed nuclear reactor vessels or compartments* from retired United States navy submarines or surface ships at the existing disposal facility at Hanford, or affect existing permits for the operation of any facility by the federal government at which United States navy reactors are decommissioned or refueled.

RCW 70.105E.080(2) (emphasis added). The only dispute is whether the CPA's definition of "mixed waste" encompasses materials produced at naval facilities other than "sealed nuclear reactor vessels or compartments." The United States claims that, pursuant to its arguments concerning the scope of "hazardous substances" in question 1, the CPA will impact the shipment of low-level waste materials not listed in the naval exemption. For support, the United States provides the declaration of Captain John C. Orzalli, who states that "[v]irtually all low level radioactive waste managed by PSNS [Puget Sound Naval Shipyard] & IMF [Intermediate Maintenance Facility] contains at least some amount of one or more hazardous substances as defined by the CPA." United States' Resp. Br., Decl. of Orzalli ¶ 5. This includes, but is not limited to, classified components such as pumps, reactor vessel heads, and reactor core bar-

rels. *Id.* ¶ 2. In response, Ecology relies exclusively on its proposed circumscription of the "hazardous substance" definition discussed in question 1.

¶22 We decline any implicit invitation to delve into factual disputes concerning the types of materials shipped from the region's naval facilities to Hanford; that would be outside the scope of permissible issues under RAP 16.16(a). However, consistent with our response to questions 1(a)-(d), it is clear the naval exemption does not cover those materials (beyond reactor vessels or compartments) that may qualify as "mixed waste" under the CPA via the broad definition of "hazardous substance." Ecology raises no persuasive argument to the contrary. Accordingly, the answer to this question is as follows: The naval exemption in RCW 70.105E.080 is limited to those materials specifically listed, including "sealed nuclear reactor vessels and compartments," but does not extend to other materials that qualify as hazardous substances under the CPA's definition of "mixed waste" as described in question 1.

4. Does RCW 70.105E.060(1)(a)(ii), which requires development of an inventory of hazardous substances potentially disposed to unlined trenches based on "actual characterization" of such substances, require the physical inspection of each and every material disposed?

¶23 The term "actual characterization" is found in RCW 70.105E.060(1)(a)(ii), which states as follows:

> The department, within sixty days after [the effective date of this act], shall order any site owner or operator utilizing landfills or burial grounds containing unlined soil trenches in which mixed wastes are reasonably believed by the department to have been disposed to:
>
> . . . .
>
> (ii) Initiate an investigation to provide the department with an inventory *based on actual characterization of all hazardous substances* potentially disposed in unlined trenches.

(Emphasis added.) There is no statutory definition of the terms "actual," "characterization," or "actual characterization" contained in the CPA or any other relevant statute. Where a term is undefined it will be given its plain and ordinary meaning. *See Cowiche Canyon Conservancy*, 118 Wn.2d at 813. The dictionary defines "actual" as "existing in fact or reality." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 22 (2002). "[C]haracterization" is defined as "the act, process, or result of characterizing," which is, in turn, defined under its variant "characterize" as "to describe the essential character or quality of." *Id*. at 376. The parties quarrel over the consequences of these dictionary definitions. Ecology argues that compliance will require physical testing in part but not completely. Ecology has historically used some degree of "process knowledge" to determine the contents of disposed materials.[6] Ecology posits compliance with the "actual characterization" requirement through the continued use of process knowledge. The United States argues that "actual characterization" can mean only physical testing because the word "actual" would be superfluous if process knowledge were an available substitute. If both process knowledge and direct testing could be used, the United States reasons, the CPA would employ only the term "characterization."

¶24 Whether "actual characterization" requires, as an epistemological matter, physical inspection of every material or allows for the use of prior record keeping is simply not clear. At the very least, the dictionary definitions do not appear to preclude Ecology's use of process knowledge. Thus, two or more reasonable interpretations are possible and the terms are ambiguous. *See Agrilink*, 153 Wn.2d at 396. Where statutory language is ambiguous, additional rules of statutory construction become helpful. For instance, we generally give great weight to Ecology's inter-

---

[6] "Process knowledge" is a substitute for physical testing that may be gleaned from data and records produced at some point when there was reliable knowledge as to the contents of the waste (e.g., when the waste was created, transported, buried, etc.). *See* WAC 173-303-070(3)(c). Ecology has the discretion to approve or disapprove of the use of process knowledge. WAC 173-303-070(4).

pretation of laws it administers. *See Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 594, 90 P.3d 659 (2004). In this case, Ecology is ultimately responsible for developing administrative rules for compliance with the CPA. Unfortunately, the federal litigation intervened before Ecology had an opportunity to make those determinations with regard to "actual characterization." We are tasked only with determining whether, as a matter of law, "actual characterization" necessarily requires physical inspection of "each and every material disposed." Because a reasonable alternative construction is available, and that construction is proposed by the agency responsible for enforcing the CPA, the answer to this question is, no.

5. If the federal court finds that certain provisions of the CPA are unconstitutional, are the remaining provisions of the statute severable?

¶25 The parties agree that any present attempt to determine whether the constitutional portions of the CPA are severable if other portions are deemed unconstitutional would be both hypothetical and speculative, particularly given the myriad possible outcomes in the federal courts. This court has declined to answer certified questions where the record before us was insufficient and any attempt to answer would be improvident. *See Hoffman*, 140 Wn.2d at 128. We do the same in this case. However, there is a dispute over the purely legal question of whether the absence of a severability clause precludes severability in all circumstances. We believe the answer to the parties' query is apparent from our case law but, as a matter of comity, we refer the district court to our recent statement in *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 67-68, 109 P.3d 405 (2005), that "[t]he presence of an applicable severability clause is evidence that the legislature would have enacted the constitutional portions of a statute without the unconstitutional portions, *State v. Anderson*, 81 Wn.2d 234, 236, 501 P.2d 184 (1972), but a severability clause is not necessary in order to meet the severability test. *See, e.g., Guard*

*[v. Jackson]*, 83 Wn. App. 325[, 921 P.2d 544 (1996), *aff'd*, 132 Wn.2d 660, 940 P.2d 642 (1997)]."

ALEXANDER, C.J.; C. JOHNSON, MADSEN, SANDERS, CHAMBERS, and FAIRHURST, JJ.; and BAKER, J. Pro Tem., concur.

¶26 J.M. JOHNSON, J. (concurring) — With the exception of footnote 3 striking one amicus brief, I concur in the majority opinion.

¶27 In this matter of widespread public interest and importance, I do not believe it is in the interests of informed judicial decision making to strike and refuse to even consider the arguments of one (of many) groups previously granted amicus status.