139 P.3d 1091 (2006)
Certification from the United States District Court for the Western District of Washington at Seattle in QWEST CORPORATION, Plaintiff,
v.
CITY OF KENT, Defendant.
No. 78293-8.
Supreme Court of Washington, En Banc.
Argued May 23, 2006.
Decided August 10, 2006.
David R. Goodnight, John H. Ridge, Loren G. Armstrong, Stoel Rives LLP, Seattle, for Petitioner/Appellant.
Michael L. Charneski, Attorney at Law, Bothell, Thomas C. Brubaker, City of Kent Legal Department, Kent, for Appellee/Respondent.
*1092 C. JOHNSON, J.
¶ 1 This case involves two certified questions from the United States District Court for the Western District of Washington. First, we are asked to determine what the legislature intended when it used the term "aerial supporting structures" in RCW 35.99.060(3)(b). Second, we are asked to determine if a telecommunications company that is entitled to reimbursement under RCW 35.99.060(3)(b) is entitled to recover the full incremental cost of the relocation or only a proportionate share of the cost based on the number of "aerial supporting structures" owned. The United States District Court noted an absence of either Washington case law or legislative history providing guidance on these issues. The court observed that any interpretation it imposed on the statute would be purely speculative, would not be binding, and would do little to settle the question for future litigants. Because the issue could arise again, the United States District Court stayed the federal court action and certified the issues to this court.

FACTUAL AND PROCEDURAL HISTORY
¶ 2 Defendant, the city of Kent (Kent), required plaintiff, Qwest Corporation (Qwest), to relocate its aerial telecommunications facilities in three different areas and move them to underground locations pursuant to RCW 35.99.060(1). The first project was located along First and Fourth Streets in Kent; the second project was located along Russell Road in Kent; the third project was located along Pacific Highway in Kent. Qwest complied with Kent's requirement and, pursuant to RCW 35.99.060(3)(b), submitted a bill to Kent for the difference in costs between a hypothetical aerial to aerial relocation and the actual aerial to underground relocation for each project. According to Qwest, it is entitled to $538,015.58 from Kent for all three projects.
¶ 3 Although Kent agrees Qwest is entitled to reimbursement under the statute, Kent disputes the amount of reimbursement it owes. Accordingly, Kent refused to pay Qwest's bill. Qwest filed an action in United States District Court. Both parties filed cross-motions for partial summary judgment on the statutory interpretation issues. The United States District Court, after hearing arguments on the motions, certified the questions to this court.

CERTIFIED QUESTIONS
(A) Does the term "aerial supporting structures" as used in RCW 35.99.060(3)(b) mean only
(1) the wide variety of telecommunications and electrical poles, glu-lams, "push-brace" poles, H-frames, towers and similar structures to which providers may attach their wires in order to suspend them in the air, or does it also include
(2) all other attachments and hardware that keep telephone wires in the air, including but not limited to strand, bolts, cross-arms, guy wires, brackets and other hardware associated with these items?
(B) Where aerial to underground relocation of authorized facilities is required by a city or town under RCW 35.99.060(1), for service providers with an ownership share of the "aerial supporting structures," is the city required to reimburse the full additional incremental cost of underground compared to aerial location or only the additional incremental cost proportionate to the percentage of "aerial supporting structures" owned by the service provider?

ANALYSIS
¶ 4 Telecommunications companies, when placing their facilities,[1] often use public rights-of-way owned by a city or town. The *1093 use of these rights-of-way by the companies is governed by chapter 35.99 RCW. The city or town that owns the right of way has the authority to require the company to relocate its facilities when reasonably necessary. RCW 35.99.060(1). Generally, the telecommunications company, also called a service provider, must bear the cost of relocation. However, the legislature carved out three exceptions to this rule, only one of which is at issue here. Under the exception at issue, the service provider may seek reimbursement when the city requires an aerial to underground relocation and the service provider has an ownership share in the aerial supporting structures. RCW 35.99.060(3)(b). Here, Kent required Qwest to relocate its facilities from an aerial to an underground location pursuant to RCW 35.99.060(1). Qwest argues that it is entitled to reimbursement for the relocation under RCW 35.99.060(3)(b). Kent agrees Qwest is entitled to reimbursement under this exception, but disputes the amount of money Qwest is entitled to recover. Specifically, the parties dispute the definition of the term "aerial supporting structures" and whether the statute requires a proportionate reimbursement scheme.

Aerial Supporting Structures
¶ 5 Qwest argues the term "aerial supporting structures" is not limited to poles or pole-like structures, but instead includes strand, down-guys, cross-arms, and any other attachment hardware used to keep aerial cable supported.[2] Qwest asserts its definition is supported by the plain and ordinary meaning of the term, by the legislative history of the statute, and by the fact that the disputed term is a term of art in the telecommunications industry.
¶ 6 Kent contends that the term "aerial supporting structures" means telephone poles, cable television poles, power transmission and power distribution poles, H-frames, glu-lams, and towers.[3] Kent argues the legislature could not have intended the term to include strand or other attachment hardware because a service provider always owns its cable, strand, and hardware even if it does not own the poles to which they are attached. Kent points out that, under Qwest's definition, the telecommunications company would always have an ownership share in the "aerial supporting structures." Thus, the statute's explicit requirement that a service provider have an ownership share in the aerial supporting structures would be superfluous. Finally, Kent asserts RCW 35.99.060(3)(b) is a narrow exception to the general rule that telecommunications companies should bear the cost of relocation. Under Qwest's definition, the articulated exception of reimbursement would swallow the nonreimbursement rule because the city would always be required to reimburse the service provider for an aerial to underground relocation.
¶ 7 RCW 35.99.060(3)(b) reads "[w]here aerial to underground relocation of authorized facilities is required by the city or town under subsection (1) of this section, for service providers with an ownership share of the aerial supporting structures, the additional incremental cost of underground compared to aerial relocation, or as provided for in the approved tariff if less, will be paid by the city or town requiring relocation." (Emphasis added.) When interpreting statutory language, our goal is to fulfill the intent of *1094 the legislature. In ascertaining this intent, the language at issue must be evaluated in the context of the entire statute. We avoid interpretations that are strained, unlikely or unrealistic. Simpson Inv. Co. v. Dep't of Revenue, 141 Wash.2d 139, 149, 3 P.3d 741 (2000).
¶ 8 Between the definition offered by Qwest and the definition offered by Kent, Kent's definition is more consistent with the overall language of the statute. Kent's definition gives the clause "for service providers with an ownership share of the aerial supporting structures" substance. For example, on the Pacific Highway relocation project at issue here, Qwest had cable attached to 100 out of 100 poles. However, Qwest owned only 21 of the 100 poles. Under Kent's proposed definition, Qwest would be entitled to reimbursement under the statute because Qwest had a 21% ownership share in the "aerial supporting structures." If, on the other hand, Qwest had not owned any of the poles on the project, Qwest would not be entitled to any reimbursement under RCW 35.99.060(3)(b). Under Qwest's proposed definition of "aerial supporting structures," Qwest would be entitled to reimbursement in both situations.

Additional Incremental Cost
¶ 9 Qwest argues that the language of RCW 35.99.060(3)(b) requires the city to reimburse a service provider for the full value of the difference between an aerial to aerial relocation and an aerial to underground relocation. Qwest contends this is because the increased cost of undergrounding is not related to the number of aerial structures owned, but results from digging the trench for the underground facilities; laying the duct, conduit, and cable; installing new equipment vaults; splicing underground cable to the existing system; and paying expenses arising from mobilization and general condition costs.[4] Qwest asserts that, as a matter of policy, the legislature intended the city to bear any additional cost of underground as compared to aerial relocation because the city, by requiring a service provider to underground its facilities, is responsible for imposing the additional cost.
¶ 10 Kent argues that the statute requires a city or town to reimburse the service provider for a proportionate share of the increased cost of undergrounding based on the share of aerial supporting structures owned by the provider. Kent maintains the reimbursement is a way to offset the expense a service provider sustains by planning, designing, erecting, and maintaining poles. Kent asserts that because a service provider does not incur these expenses when it attaches its cable to someone else's pole, the legislature did not intend to reimburse the provider in that circumstance.
¶ 11 The language of RCW 35.99.060(3)(b) provides "[w]here aerial to underground relocation of authorized facilities is required by the city or town under subsection (1) of this section, for service providers with an ownership share of the aerial supporting structures, the additional incremental cost of underground compared to aerial relocation, or as provided for in the approved tariff if less, will be paid by the city or town requiring relocation." (Emphasis added.) Statutory interpretation requires this court to give effect to the legislature's intent. When the language of a statute is unambiguous, the legislative intent is apparent. Where the legislature omits language from a statute, whether intentionally or inadvertently, this court will not read into the statute the language it believes was omitted. State v. Cooper, 156 Wash.2d 475, 480, 128 P.3d 1234 (2006).
¶ 12 Neither party asserts that any phrase in the statute, other than "aerial supporting structures" is ambiguous. When a service provider has an ownership share of "aerial supporting structures," the city must reimburse the provider the additional incremental *1095 cost. The term "incremental cost" is not defined in the statute or in the definitions section of chapter 35.99 RCW. In the absence of a given definition, we turn to a standard dictionary to ascertain the plain and ordinary meaning of a term. State v. Watson, 155 Wash.2d 574, 579, 122 P.3d 903 (2005). Incremental is the adjective form of the word increment. Increment is defined as "the process of increasing in number, size, quantity, or extent." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 889 (4th ed.2000). Thus, the term "incremental cost" refers to an increase in cost. We find the phrase "the additional incremental cost of underground compared to aerial relocation" refers to an amount equal to the actual aerial to underground cost minus the estimated aerial to aerial relocation cost.

CONCLUSION
¶ 13 The term "aerial supporting structures" refers to poles and pole-like structures. RCW 35.99.060(3)(b) requires a city to reimburse a service provider for an aerial to underground relocation of its facilities when the service provider owns a portion of the aerial supporting structures as defined above. The amount the city is required to reimburse the service provider is the difference between an estimated aerial to aerial relocation and the actual aerial to underground relocation of the same facilities.
Concurring: ALEXANDER, C.J., BRIDGE, CHAMBERS, OWENS, J.M. JOHNSON, JJ.
MADSEN, J. (concurring).
¶ 14 I concur in the majority's conclusion that under RCW 35.99.060(3)(b), the phrase "additional incremental cost of underground compared to aerial relocation" means the difference between the actual aerial to underground cost less the estimated amount that aerial to aerial relocation would cost. Accordingly, I agree with the majority's answer to the second certified question.
¶ 15 However, the majority's answer to the second certified question makes it unnecessary, under the facts of this case, to answer the first certified question. Because Qwest owns 21 of the poles along the highway where the city of Kent required underground relocation, there is no dispute that under any proposed construction of the term "aerial supporting structures" Qwest has an ownership share in the aerial supporting structures. Thus, it is immaterial in this case how that ownership share is determined because under the statute's plain language the additional incremental cost of relocation must be paid if the telecommunications company has such an ownership share.
¶ 16 When the court unnecessarily construes a statutory term, its construction is dicta. In Davis v. Dep't of Licensing, 137 Wash.2d 957, 967, 977 P.2d 554 (1999), for example, the court declined to follow its construction in a prior case of the term "juvenile" in RCW 46.20.265(1) as limited to persons 13 to 18 years of age. The court concluded the construction was dictum because there was no question that the parties in the prior case, who were all under 18, were juveniles. Id. Similarly, in Gilbert v. Sacred Heart Medical Center, 127 Wash.2d 370, 376, 900 P.2d 552 (1995), the court noted that the court's discussion in a prior case of the one- and three-year limitations period in RCW 4.16.350 was dicta, since the issue in the prior case involved the eight-year limitations period in the statute.
¶ 17 Here, the majority's construction of the term "aerial supporting structures" in RCW 35.99.060(3)(b) is dicta because, as noted, there is no question that Qwest has an ownership share in aerial supporting structures under any definition of the term. Accordingly, the majority's discussion of the first certified question lacks precedential value.
¶ 18 Moreover, "`[p]rinciples of judicial restraint dictate that if resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented.'" Hayden v. Mut. of Enumclaw Ins. Co., 141 Wash.2d 55, 68, 1 P.3d 1167 (2000) (quoting State v. Peterson, 133 Wash.2d 885, 894, 948 P.2d 381 (1997) (Talmadge, J., concurring)); see, e.g., Harbour Vill. Apartments v. City of Mukilteo, 139 Wash.2d 604, 617, 989 P.2d 542 *1096 (1999); State v. Blackwell, 120 Wash.2d 822, 830, 845 P.2d 1017 (1993); In re Dependency of Penelope B., 104 Wash.2d 643, 660, 709 P.2d 1185 (1985). The court should follow this precept in this case.[1]
¶ 19 Finally, the parties touch on a number of factors that might affect the legislative decision whether a company should be reimbursed for relocating telecommunications facilities, and to what extent. The city contends that the legislature could not have intended that the same reimbursement amount was intended in the case of a company owning only 1 of 100 existing poles as in the case of a company owning all 100 poles. The city raises the specter of a telecommunications company installing a single pole in an area in order to assure full future reimbursement should a city require underground relocation. Qwest insists, however, that the costs of underground relocation are not proportional to the number of poles owned, and that replacement of an aerial plant is de minimis compared to the cost of installing new facilities underground. Qwest also says that neither the telecommunications company nor its customers benefit from aerial-to-underground relocation and, in fact, the company is forced to waste functional aerial plant. The city disputes this, pointing out that the telecommunications company may be able to pull and reuse existing, expensive poles. The parties' briefing also suggests that a telecommunications company will benefit over time from underground relocation because maintenance costs are lower for underground facilities than for aerial facilities. All of this suggests that the court should proceed cautiously and decline to construe any portion of RCW 35.99.060(3)(b) that is unnecessary to decide this case.
¶ 20 It is apparent there are concerns particular to the industry, as well as significant policy considerations underscoring the legislature's decision to provide for reimbursement when facilities are relocated underground. Since the statutory language is clear as to the second certified question, and that clarity disposes of this case, the court should go no further. This court lacks the authority, the resources, the procedures, and complete information possessed by or available to the legislature, all of which would be necessary to adequately weigh competing interests and decide how reimbursement should be determined. If the legislature intended a different result, it should amend the statute.
Concurring: SANDERS, FAIRHURST, JJ.
NOTES
[1] Facilities are defined as "all of the plant, equipment, fixtures, appurtenances, antennas, and other facilities necessary to furnish and deliver telecommunications services and cable television services, including but not limited to poles with crossarms, poles without crossarms, wires, lines, conduits, cables, communication and signal lines and equipment, braces, guys, anchors, vaults, and all attachments, appurtenances, and appliances necessary or incidental to the distribution and use of telecommunications services and cable television services." RCW 35.99.010(2).
[2] Strand is steel wire attached directly to cable in order to support the cable between poles. Cable is not strong enough to support itself and strand is always used for aerial cable. When poles are perfectly in line, the cable and strand are attached to the poles using a variety of fasteners such as nuts, bolts, washers, and clamps. However, when one pole is out of line, attaching the cable to the pole would exert a sideways as well as downward force upon the pole. Here, a company might attach a cross-arm to a pole. A cross-arm is a piece of wood attached to a pole that sticks out from the pole far enough so that the cable may be attached to the cross-arm without changing the cable's direction. This keeps the cable in a straight line and prevents it from exerting the sideways and downward force upon the pole. A company could also attach the cable to the pole itself and then use a down guy, a piece of galvanized steel, attached to the pole in the opposite direction to offset the force exerted by the cable.
[3] H-frames consist of multiple vertical poles attached by a cross-brace. A glu-lam is generally the same height as a transmission pole but is composed of multiple planks or boards glued together for structural strength. It looks more like a construction beam than a pole.
[4] Qwest defines mobilization cost as "the cost associated with physically getting project materials and construction equipment to a project site at the beginning of a project." Qwest defines general conditions costs as "the costs associated with the project as a whole but not specifically allocated to a particular task, such as the costs associated with project superintendents and engineers, ongoing equipment rentals or maintenance, safety and flag personnel to direct traffic, equipment and material supply storage, etc." Pl.'s Br. at 18, n 7 & 8.
[1] Whether to answer a certified question pursuant to chapter 2.60 RCW is within the court's discretion. Broad v. Mannesmann Anlagenbau, A.G., 141 Wash.2d 670, 676, 10 P.3d 371 (2000); accord, e.g., Fluor Hanford, Inc. v. Hoffman, 154 Wash.2d 730, 736, ¶ 4, 116 P.3d 999 (2005); Hoffman v. Regence Blue Shield, 140 Wash.2d 121, 128, 991 P.2d 77 (2000), overruled in part on other grounds by Wash. Indep. Tel. Ass'n v. Wash. Util. & Transp. Comm'n, 148 Wash.2d 887, 64 P.3d 606 (2003); see RAP 16.16(a).