

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE DEC 0 6 2018
~~Fairhurst~~ CJ
CHIEF JUSTICE

This opinion was filed for record

at 8 a.m. on Dec 6, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

SPOKANE COUNTY, a political subdivision
of the State of Washington; PIERCE
COUNTY, a political subdivision of the State
of Washington; DOUGLAS COUNTY, a
political subdivision of the State of
Washington; LEWIS COUNTY, a political
subdivision of the State of Washington; and
KITSAP COUNTY, a political subdivision of
the State of Washington,

    Appellants,

MASON COUNTY, a political subdivision
of the State of Washington; CHELAN
COUNTY, a political subdivision of the
State of Washington; and CITY OF
SPOKANE, a political subdivision of the
State of Washington

    Plaintiffs,

    v.

STATE OF WASHINGTON
DEPARTMENT OF FISH AND WILDLIFE,

    Respondent.

No. 95029-6

Filed   DEC 0 6 2018

OWENS, J. — This case asks us to determine the geographic scope of permitting authority delegated to the State of Washington Department of Fish and Wildlife (Department) over hydraulic projects. A "hydraulic project" is defined as "the construction or performance of work that will use, divert, obstruct, or change the natural flow or bed of any of the salt or freshwaters of the state." RCW 77.55.011(11). Entities seeking to undertake hydraulic projects must apply for and obtain permits from the Department before commencing work. RCW 77.55.021. In this case, a coalition of Washington State counties (Counties) challenge the Department's statutory authority to regulate the construction or performance of work that will occur exclusively above the ordinary high-water line.

We hold that the plain language of the statute looks to the reasonably certain effects of hydraulic projects on waters of the state in determining the scope of the Department's permitting authority, and we conclude that at least some projects above the ordinary high-water line are reasonably certain to affect those waters. An examination of relevant legislative history confirms that the legislature intended the Department's regulatory jurisdiction to include projects above the ordinary high-water line that affect state waters. We affirm the trial court.

## PROCEDURAL AND FACTUAL HISTORY

Chapter 77.55 RCW, construction projects in state waters, hereinafter referred to as the "Hydraulic Code," was first enacted in 1943. *See* LAWS OF 1943, ch. 40, § 1.

From its outset, the Hydraulic Code was intended to protect fish life. *Id.* The Hydraulic Code requires anyone planning to undertake a hydraulic project to obtain a preconstruction approval permit from the Department to ensure "the adequacy of the means proposed for the protection of fish life." RCW 77.55.021(1). The Department can deny or condition a permit only for the purpose of protecting fish life. RCW 77.55.021(7)(a). The Department's regulatory authority encompasses hydraulic projects, which are defined based on their effects on waters of the state rather than their location relative to those waters. *See* RCW 77.55.011(11).

The Counties primarily take issue with rules promulgated by the Department in 2015, chapter 220-660 WAC (2015 Rules). The 2015 Rules specify that a permit is required for bridge maintenance and construction, even if the work to be performed will occur above the ordinary high-water line:

> An HPA [hydraulic project approval] is required for all construction or repair/replacement of any structure that crosses a stream, river, or other water body regardless of the location of the proposed work relative to the [ordinary high-water level] of state waters. An HPA is also required for bridge painting and other maintenance where there is potential for paint, sandblasting material, sediments, or bridge parts to fall into the water.

WAC 220-660-190. The Counties seek an exemption from the permitting requirement for work that takes place entirely above the ordinary high-water line, hereinafter referred to as "upland projects."

The Counties first sought an exemption for upland projects during the notice and comment process for the 2015 Rules. After the 2015 Rules were promulgated, the

3

Counties filed their concerns with the attorney general. Thereafter, the attorney general issued a formal legal opinion directly answering the question presented in this case. 2016 Op. Att'y Gen. No. 6. The attorney general opined that the statute is unambiguous and that the Department's permitting jurisdiction extends to all work that will use, divert, obstruct, or change the natural flow or bed of any of the salt or freshwaters of the state, regardless of whether the activity is above or below ordinary high-water lines. *Id.* at 5-7.

The Counties next brought this legal action, seeking a declaratory judgment and injunction under Washington's Administrative Procedure Act, chapter 34.05 RCW. RCW 34.05.570(2)(c). The trial court found that "[t]he Hydraulic Code, [chapter] 77.55, is not ambiguous regarding the extent of [the Department's] Hydraulic Project Approval permitting and/or regulatory authority" and that "[s]uch permitting and/or regulatory authority is not limited to activities taking place at or below the Ordinary High-water Line." Clerk's Papers at 147. The Counties sought this court's direct review of the trial court's decision, which we granted. The court also granted the motions of multiple sovereign tribes to submit amicus briefs, which primarily stressed the need to regulate upland projects in order to protect fish.

## ISSUE

Did the legislature intend to limit the Department's permitting and regulatory authority to cover only projects that take place at least partially at or below the ordinary high-water line?

4

ANALYSIS

The Counties challenge the 2015 Rules under the Administrative Procedure Act, arguing that the rule should be struck down as "[o]utside the statutory authority of the agency." RCW 34.05.570(4)(c)(ii). The 2015 Rules are presumptively valid, and the Counties bear the burden of showing that the Department exceeded its statutory authority in promulgating them. *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003).

This case thus requires us to engage in statutory interpretation, which is an issue of law that we review de novo. *State v. Velasquez*, 176 Wn.2d 333, 336, 292 P.3d 92 (2013). "Our starting point must always be 'the statute's plain language and ordinary meaning.'" *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (quoting *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999)). "Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996). When the plain language is unambiguous, subject to only one reasonable interpretation, our inquiry ends. *Velasquez*, 176 Wn.2d at 336. Additionally, "a reading that results in absurd results must be avoided because it will not be presumed that the legislature intended absurd results." *State v. Delgado*, 148 Wn.2d 723, 733, 63 P.3d 792 (2003). We need not utilize interpretive tools such as

legislative history when statutory language is unambiguous. *Velasquez*, 176 Wn.2d at 336.

To prevail, the Counties must show two things to be true. First, as a matter of statutory interpretation, they must show that the word "will," as used in RCW 77.55.011(11), was intended to limit the Department's permitting and regulatory authority to cover only projects that are absolutely certain to "use, divert, obstruct, or change the natural flow or bed of any of the salt or freshwaters of the state." RCW 77.55.011(11). Second, they must show that only projects that take place at least partially at or below the ordinary high-water line meet that level of certainty. As a matter of statutory interpretation, we hold that the Counties are wrong on the former contention. As a matter of common sense and practical experience, we find the latter is not true. Although the statute is unambiguous, we conclude the legislative history and context of the Hydraulic Code supports the Department's authority to regulate upland projects that affect waterways and fish.

I.     *RCW 77.55.011(11) Does Not Require Preordained Certainty as a Condition of Department Regulation or Permitting*

The Department has the authority to permit and regulate hydraulic projects. RCW 77.55.021. "Hydraulic project" is a term of art, defined as "the construction or performance of work that will use, divert, obstruct, or change the natural flow or bed of any of the salt or freshwaters of the state." RCW 77.55.011(11). This definitional test

looks to the effect that the project will have on the waters of the state and is referred to hereinafter as "the effects test."

The Counties argue that the legislature's use of the word "will," as opposed to "might" or "may," in the effects test was intended to limit the Department's jurisdiction exclusively to projects that are absolutely certain to meet the effects test. The Counties rely primarily on other courts' interpretations of the word "will" as used in other statutes and definitions of "will" from outdated editions of *Black's Law Dictionary.* BLACK'S LAW DICTIONARY 1598 (6th ed. 1990) ("An auxiliary verb commonly having the mandatory sense of 'shall' or 'must.' It is a word of certainty, while the word 'may' is one of speculation and uncertainty."). The Counties likely rely on outdated editions of *Black's* because the verb "will" is absent from the current 10th edition. Elsewhere within the current edition of *Black's,* however, we see that "[i]n dozens of cases, courts have held *may* to be synonymous with *shall* or *must.*" BLACK'S LAW DICTIONARY 1127 (10th ed. 2014) (defining "may"). If "will" and "may" both commonly mean "shall" or "must," the Counties overemphasize the legislature's choice of "will" rather than "may."

A catch-22 would result if permits were required only for projects absolutely certain to "use, divert, obstruct, or change the natural flow or bed" of waters of the state. For one, if a proposed project lacks a permit, it is not certain to be completed. What is more, the Department can condition the issuance of a permit upon changes to the proposed project, which may reduce the certainty of the effect of the project on waters of

7

the state. In essence, no project that requires a permit would have effects certain enough to require a permit.

Rather than accept this absurd result, we hold that the plain language of RCW 77.55.011(11) is unambiguous because the ordinary meaning of the word "will" operates as a prediction, not a prophecy. We conclude that projects that are reasonably certain to "use, divert, obstruct, or change the natural flow or bed" meet the effects test. And we defer to the Department's expertise in determining which projects meet that standard. *See City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

II.     *There Are Many Examples of Upland Projects That Meet the Effects Test*

The Counties contend that projects that are entirely landward of the ordinary high-water line are not subject to the Hydraulic Code. The Counties' argument proceeds as follows: (1) the Department's jurisdiction covers solely projects that are certain to use, divert, obstruct, or change the flow or beds of waterways, (2) only projects that are at least partially below the ordinary high-water line are certain to use, divert, obstruct, or change the flow or beds of waterways, therefore, (3) the Department's jurisdiction does not cover upland projects. Although we disagree with the first premise, the second is clearly not true.

The Department raises many examples of upland projects that "use, divert, obstruct, or change the natural flow or bed" of waterways. One such example is the

installation of storm water discharge systems, which divert and increase the flow of beds of waterways by funneling storm water into them. Another example is the removal of vegetation near a waterway, which causes deposition of eroded sediments into the waterway's bed and changes water temperature by eliminating shade coverage. Further examples include dike construction, bulkhead construction, marinas and other overwater structures, and bank stabilization.

Moreover, the Hydraulic Code contains a number of specific requirements and exemptions for specific upland projects, supplementing the general permitting requirement of RCW 77.55.021. For instance, storm water discharge projects have additional permitting requirements, while removal of some invasive landward vegetation is expressly exempted from the permitting requirement. RCW 77.55.161, .051. Replacement bulkheads must generally be landward of their predecessors and permits are required. RCW 77.55.141(2)(b). For maintenance and repair of overwater structures and existing outfalls, the Department issues distinctive, renewable, and longer-lasting permits. RCW 77.55.151. None of these upland project examples contains an independent grant of regulatory or permitting authority.

Each of these statutory examples demonstrates that the legislature plainly intended the Department to be able to regulate upland activities. The Counties' argument that these examples are "exceptions" to their proposed rule that the Department cannot regulate upland projects is incorrect because under such a rule, the

Department would lack jurisdiction to enforce and grant these special permits, exemptions, and additional conditions. Rather than render these statutory provisions superfluous, we conclude the plain language of the Hydraulic Code evinces that the legislature recognized that many upland projects meet the effects test.

III. *Textual and Legislative History Resolves Any Ambiguity in Favor of the Department*

Because the plain language of the Hydraulic Code is unambiguous, we need not analyze the statute's legislative history. However, we note that legislative history supports our conclusion that the Department has regulatory authority over upland projects. Based on the textual and legislative history of the Hydraulic Code and expired subsections of the current statute, we find it clear that the legislature intends the Department's regulatory authority to reach above the ordinary high-water line to include upland projects that meet the effects test.

a. *The Legislative History of the Hydraulic Code Demonstrates That "Hydraulic Projects" Have Traditionally Been Understood To Include Upland Projects That Meet the Effects Test*

In 2005, the legislature reorganized the Hydraulic Code to increase its clarity without effectuating any policy changes. *See* S.B. REP. ON SECOND SUBSTITUTE H.B. 1346, at 2, 59th Leg., Reg. Sess. (Wash. 2005). An earlier version of the 2005 bill contained precatory language regarding legislative intent that might have suggested that the Department's regulatory authority did not extend to landward projects. The Northwest Indian Fisheries Commission raised a concern that the new language in the

bill would "exclude current projects, like bulkheads and streambank projects, which are currently subject to the hydraulic project approval process." *See* H.B. REP. ON H.B. 1346, at 3, 59th Leg., Reg. Sess. (Wash. 2005). In response, the language that caused the concern was removed. *See id.* at 1-2. That action demonstrates that in 2005, the legislature understood that the Hydraulic Code granted the Department regulatory authority over some upland projects and intended to preserve that authority in its 2005 reorganization.

Before the 2005 reorganization, two attempts were made to limit the Department's authority to regulate landward projects. First, in 1993, the Department[1] proposed rules that would regulate storm water runoff projects in upland areas. In response, two members of the 1993 Senate, Senators McCaslin and Barr, introduced S.B. 5085, which would have restricted the Department's regulatory authority to projects that occur at or below the ordinary high-water line. *See* S.B. REP. ON S.B. 5085, 53d Leg., Reg. Sess. (Wash. 1993). The bill was described as "[m]odifying the hydraulic project approval authority of the [D]epartment." *See id.* at 1. A number of environmental groups testified against the bill because "[s]tormwater runoff may affect fish life and both departments desire to control human activities in upland areas." *Id.* at 2. The bill did not pass.

---

[1] In 1993, two separate agencies, the Department of Fisheries and the Department of Wildlife, fulfilled the role now performed by the Department of Fish and Wildlife; they have since been consolidated.

11

Then in 1995, companion bills S.B. 5632 and H.B. 1597 proposed to limit the Department's permitting authority over hydraulic projects by expressly excluding upland projects from the scope of the Department's jurisdiction.[2] Section 8 of each of the bills stated, "The hydraulic project approval authority of the department shall be limited to construction or other work that occurs at or below the mean higher high-water line in salt water and estuaries or at or below the ordinary high-water line in fresh water." S.B. 5632, § 8(1), 54th Leg., Reg. Sess. (Wash. 1995); H.B. 1597, § 8(1), 54th Leg., Reg. Sess. (Wash. 1995). If upland projects did not "use, divert, obstruct, or change the natural flow or bed" of the state's waters, then the proposed upland exception in S.B. 5632 and H.B. 1597 would have been superfluous. Neither bill passed. However, the existence of these bills demonstrates that the legislature understood the Department's permitting authority to include upland activities.

Thus, multiple failed attempts by the legislature to expressly exclude upland activities demonstrate that the legislature knew that the effects test does not, by its plain language or in practice, exclude upland projects.

---

[2] In 1995, the Department's permitting authority was set forth in former RCW 75.20.100 (1993), which contained roughly the same language as current RCW 77.55.011(11). *See* LAWS OF 1993, 1st Spec. Sess., ch. 2, § 30 (requiring a permit when "any person or government agency desires to construct any form of hydraulic project or perform other work that will use, divert, obstruct, or change the natural flow or bed of any of the salt or fresh waters of the state . . .").

### b. *An Expired Provision of the Hydraulic Code Also Indicates That Upland Projects Are within the Department's Jurisdiction*

We do not rely solely on proposed but unenacted legislation in determining that the legislature intended the Department to regulate upland activities. RCW 77.55.031 and its legislative history show that upland activities, including bridge construction and maintenance, are and have historically been within the Department's intended jurisdiction.

In 2012, the legislature amended the Hydraulic Code in S.B. 6406. SECOND ENGROSSED SUBSTITUTE S.B. 6406, 62d Leg., 1st Spec. Sess. (Wash. 2012). The original version of the bill would have modified RCW 77.55.021 to require permits only "before conducting a hydraulic project *at or below the ordinary high-water line* . . . ." S.B. 6406, § 102(1)(a)(i), 62d Leg., Reg. Sess. (Wash. 2012) (emphasis added). The original version of S.B. 6406 also proposed to create an expedited application and approval process for certain upland projects. *Id.* § 102(1)(a)(ii). Upland projects that would have been subject to the expedited review process included the following: "[r]epair or maintenance of an existing bridge, dike, or levee adjacent[3] to the ordinary high-water line"; construction of a new or replacement bridge crossing waters of the state; shoreline or streambank protection adjacent to the

---

[3] The original bill included a definition of "adjacent," to mean within 50 or 200 feet of the ordinary high-water line, depending on whether the waterways' channels were confined. *See* S.B. 6406, § 101(28).

13

ordinary high-water line; outfall that discharges into the waters of the state; and stream channelization adjacent to the ordinary high-water line. *Id.* The second engrossed substitute version of S.B. 6406 eliminated these proposed provisions and returned to the pure effects test. *See* SECOND ENGROSSED SUBSTITUTE S.B. 6406, § 102.

However, the second engrossed substitute bill did retain language implementing a new $150 fee for hydraulic project permits "where the project is located at or below the ordinary high-water line." *Id.* § 103. That bill was codified in 2012 as RCW 77.55.321. If RCW 77.55.021 did not apply to upland projects, the language specifying that the $150 permit fee was required only for projects at or below the ordinary high-water line would be superfluous.

Although RCW 77.55.321 expired by its own terms in 2017, we conclude that its passage clearly demonstrates that the legislature understood the grant of permitting jurisdiction to the Department under RCW 77.55.021 to apply to upland activities that pass the effects test articulated in RCW 77.55.011(11).

## CONCLUSION

We hold that under the plain language of RCW 77.55.021, the Department's jurisdictional grant of permitting authority includes upland projects that meet the effects test set forth in RCW 77.55.011(11). We further hold that the effects test requires reasonable certainty, not absolute certainty. Finally, we defer to the expertise

of the Department to determine which upland activities meet the effects test.

Accordingly, we affirm the trial court's order.

*Spokane Cty., et al., v. Wash. Dep't of Fish and Wildlife,*
No. 95029-6

15

*Spokane Cty., et al., v. Wash. Dep't of Fish and Wildlife,*
No. 95029-6

_____
Owens, J.

WE CONCUR:

_____
Fairhurst, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Stephens, J.

_____
Wiggins, J.

_____

_____
Yu, J.

No. 95029-6

GORDON McCLOUD, J. (concurring)—I agree with the majority's

conclusion that the permitting requirements of chapter 77.55 RCW apply to all

projects that meet the "effects test" of RCW 77.55.011(11). Majority at 6-7, 2. I

also agree that projects above the ordinary high-water line might meet that test. *Id.*

Finally, I agree that when interpreting RCW 77.55.011(11)'s effects test—which

asks whether the proposed project "will use, divert, obstruct," etc., the "natural

flow or bed . . ."—"the ordinary meaning of the word 'will' operates as a

prediction, not a prophecy." *Id.* at 8.

I write separately because I disagree with the majority's additional—and I

believe unnecessary—statement that the word "will" (which is used in RCW

77.55.011(11)) is synonymous with "may." *Id.* at 7. In general, when used as a

directive, "will" is actually mandatory and implies a mandatory requirement. *See,*

*e.g., Pekin Ins. Co. v. Hanquier*, 984 N.E.2d 227, 230 (Ind. 2013) ("'Will' is

defined as [a]n auxiliary verb commonly having the mandatory sense of 'shall' or

1

'must.'" (citing BLACK'S LAW DICTIONARY 823 (5th ed. 1983))); *Burnell v. Smith*,

122 Misc. 2d 342, 345, 471 N.Y.S.2d 493 (Sup. Ct. 1984); *Reg'l Transp. Dist. v.*

*Outdoor Sys., Inc.*, 34 P.3d 408, 420 (Colo. 2011); *In re Kids Creek Partners L.P.*,

220 B.R. 963, 973 (Bankr. N.D. Ill. 1998).

But "will" is complicated, and it is more than just a directive verb. To figure

out the meaning of such an undefined, nonlegal word when used in a statute, we

customarily turn to regular dictionaries, rather than legal dictionaries. *Nissen v.*

*Pierce County*, 183 Wn.2d 863, 881, 357 P.3d 45 (2015); *HomeStreet, Inc. v. Dep't*

*of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009) (citing *Garrison v. Wash.*

*State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976)).

Several dictionaries state that "will" can be a statement of future tense, of

"strong intention or assertion about the future," or a "probability or expectation

about something . . . ." GOOGLE DICTIONARY,

https://www.google.com/search?q=dictionary&rlz=1C1GGRV_enUS748US748&

oq=dictionary&aqs=chrome..69i57j69i61j0l4.9681j0j4&sourceid=chrome&ie=UT

F-8#dobs=will [https://perma.cc./X8VN-KJQA]; *see also* MERRIAM-WEBSTER

ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/will

[https://perma.cc/X86P-KLT7].

Another meaning of "will"—whereas here it is used as a nondirective, predictive, verb—is "inevitability." MERRIAM-WEBSTER ONLINE DICTIONARY, *supra* ("used to express inevitability," as in "accidents *will* happen").

But still another meaning of "will" in this context is "probability." *Id.* ("used to express probability and often equivalent to the simple verb" as in "that *will* be the babysitter"). In fact, in the *Merriam-Webster Online Dictionary* cited, the "probability" definition precedes the "inevitability" definition (by one).

And yet another meaning of "will" is "capable of" or "can" which requires no prediction at all about the certainty of the occurrence. https://www.dictionary.com/browse/will [https://perma.cc/L9TF-V3WF] ("am (is, are, etc.) determined or sure to (used emphatically): *You would do it. People will talk.*"; "am (is, are, etc.) accustomed to, or do usually or often: *You will often see her sitting there. He would write for hours at a time.*"; "am (is, are, etc.) habitually disposed or inclined to: *Boys will be boys. After dinner they would read aloud.*"; "am (is, are, etc.) capable of; can: *This tree will live without water for three months.*"; "am (is, are, etc.) going to: *I will bid you "Good night.*").

Given the variety of definitions, we need to look at the context in which "will" is used here. I agree with the majority that in this context, RCW 77.55.011(11)'s use of "will" does not mean total inevitability. It means

probability or expectation about something, as our first cited definition states. But that is because in the RCW 77.55.011(11) context, "will" is a nondirective verb and refers to a future consequence. It is not because we are now conflating "will" with "may" when it is used in a directive rule or statute.

For those reasons, I respectfully concur.

Gordon McCloud, J.

González, J.

5