# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PROTECT ZANGLE COVE; COALITION TO PROTECT PUGET SOUND HABITAT; and WILD FISH CONSERVANCY, | No. 52906-8-II |
| Appellants, | |
| v. | |
| WASHINGTON DEPARTMENT OF FISH AND WILDLIFE; JOE STOHR, Acting Director of the Washington Department of Fish and Wildlife; and PACIFIC NORTHWEST AQUACULTURE, LLC, | PUBLISHED OPINION |
| Respondents, | |
| and | |
| TAYLOR SHELLFISH COMPANY, INC., | |
| Respondent-Intervenor. | |

CRUSER, J. — Protect Zangle Cove, Coalition to Protect Puget Sound Habitat, and Wild Fish Conservancy (collectively, Appellants) sought declaratory and injunctive relief in Thurston County Superior Court, alleging that the "Hydraulic Code," chapter 77.55 RCW, permitting requirements apply to the aquaculture industry and that WAC 220-660-040(2)(l), which largely exempts aquaculture from Hydraulic Code permitting requirements, is an invalid exercise of the Commission of Fish and Wildlife's statutory rulemaking authority. In addition to the Washington Department of Fish and Wildlife, (WDFW), Appellants named Pacific Northwest Aquaculture

(PNA) as a defendant and sought an injunction to prevent PNA from continuing construction on a proposed geoduck farm on Zangle Cove until PNA received a Hydraulic Project Approval (HPA) permit. PNA's business partner, Taylor Shellfish Company, Inc. (Taylor Shellfish) moved to intervene and was added as a respondent.

Following the superior court's order dismissing each claim, Appellants appealed. They argued that the trial court erred when it concluded that WDFW had no authority to enforce the Hydraulic Code permitting requirements on aquaculture under RCW 77.115.010(2) because that statute does not exempt aquaculture from Hydraulic Code permitting requirements and WAC 220-660-040(2)(l) is thus an invalid rule because it is based on an incorrect interpretation of RCW 77.115.010(2).[1] In addition, because the trial court did not reach Appellants' claim for injunctive relief against PNA due to its resolution of the statutory interpretation issues, Appellants argue that we either should enjoin PNA from continuing construction on its geoduck farm until it obtains an HPA permit, or we should remand this issue to the superior court.

We hold that WAC 220-660-040(2)(l) is a valid rule properly within the scope of the Commission of Fish and Wildlife's statutory rulemaking authority. In addition, we decline to reach the merits of the Appellants' claim for injunctive relief against PNA because under WAC 220-660-040(2)(l), PNA's geoduck cultivation activities are exempt from HPA permit requirements.

Accordingly, we affirm.

---

[1] RCW 77.115.010 was amended in 2018 but this amendment has no impact on our analysis, so we cite to the current version. LAWS OF 2018, ch. 179, § 6.

FACTS

I. AQUACULTURE

Aquaculture is the process of "growing, farming, or cultivating" marine or freshwater plants and animals such as shellfish, fish, and seaweed in marine or fresh waters by an aquatic farmer. RCW 15.85.020(1)-(3). As of 2015, commercial shellfish aquaculture has occupied about 25 percent of Washington's shoreline.

Practices involved in shellfish cultivation vary depending on the species and include different materials and equipment. Common techniques used in the cultivation of oysters, clams, and mussels include suspending shellfish from floating rafts or platforms, growing shellfish in plastic net bags that are either placed directly in the tidelands or attached to artificial structures, and harvesting shellfish either by hand or mechanically.

Of particular relevance here, geoduck cultivation begins with removal of debris, such as rocks and driftwood, and extraction of predators, either by hand or with mechanical equipment. Polyvinyl chloride (PVC) tubes are then inserted into the beach during low tide, leaving a few inches of the pipe exposed. Geoduck seed clams are placed into the tubes where they burrow into the substrate. A single acre will often contain approximately 42,000 tubes, with one tube for every square foot of beach. Plastic netting is placed over the tubes to keep predators away until the young geoduck clams can burrow deeply enough to safely avoid them. Geoducks are harvested four to seven years after planting, often using hand-operated water-jet probes that discharge pressurized water, allowing hand extraction of geoducks that are buried as deep as three feet into the substrate.

Activities involved in aquaculture have both beneficial and harmful environmental impacts. For example, geoduck culture has been observed to reduce aquatic vegetation. Hydraulic

harvests of geoducks may disturb the substrate, disrupt fish travel patterns, and can lead to loss of food sources for endangered species such as Chinook salmon. Chinook salmon are a critical food source for southern resident orca whales.

Some shellfish aquaculture practices may also benefit the environment. For example, in the majority of cases, shellfish aquaculture improves water quality and sequesters carbon and nutrients. Tubes used in geoduck cultivation can increase the presence of transient fish and macro invertebrate species.

## II. ZANGLE COVE GEODUCK FARM

Respondent PNA, in partnership with Taylor Shellfish, plans to operate a commercial geoduck aquaculture farm on Zangle Cove. Zangle Cove is a privately-owned, triangle-shaped estuary of "sandy, muddy beach." Clerk's Papers (CP) at 490. The proposed property is a single family residence, and the adjacent properties are also single family homes with small waterfront lots. Geoduck cultivation on the 1.1 acre inter-tidal property would involve installation of 47,900 PVC tubes with approximately 16 area nets covering the tubes. Nets and tubes will be removed after 18 months, once the geoducks have burrowed deeply enough to be safe from predators. Five to six years after planting, geoducks will be hand-harvested using a water pressure device.

PNA and Taylor were required to obtain permits and environmental reviews for their project. Thurston County reviewed PNA's proposal and issued a mitigated determination of non-significance (MDNS) under the State Environmental Policy Act (SEPA), ch. 43.21C RCW. The MDNS imposed 18 conditions to diminish environmental impacts of the proposal. PNA also applied for a Shoreline Substantial Development Permit (SSDP) under the Shoreline Management Act of 1971 (SMA), ch. 90.58 RCW. The permit was approved subject to 14 conditions. In

4

addition, PNA's farm was authorized by the U.S. Army Corps of Engineers under a nationwide general permit that likewise includes conditions aimed at protecting fish life.

PNA submitted an application for an HPA permit but did not ultimately complete the application process or receive an HPA permit. PNA began construction on its geoduck farm without an HPA permit.

### III. THE HYDRAULIC CODE

In 1943, the legislature passed the first version of the Hydraulic Code, describing it as "[a]n Act relating to the protection of fish life." LAWS OF 1943, ch. 40. At that time, the Department of Fisheries (Fisheries) and the Department of Game (Game) were separate entities equally responsible for approving proposed hydraulic projects that would "use, divert, obstruct or change the natural flow or bed of any river or stream" or "utilize any of the waters of the state."[2] *Id.* at § 1. These agencies reviewed plans submitted by entities that intended to engage in hydraulic projects. *Id.* Approval of an entity's plan was conditioned on the adequacy of the plan's measures to protect fish life. *Id.*

Fisheries and Game merged in 1993 and became the current Department of Fish and Wildlife. *See* LAWS OF 1993, 1st Spec. Sess., ch. 2. WDFW is presently responsible for enforcing the Hydraulic Code. RCW 77.55.021(1)[3]; RCW 77.55.011(5)[4]. The Commission of Fish and

---

[2] In 1983, the legislature expressly provided that the Hydraulic Code also applies to projects that occur in saltwater and marine habitats. LAWS OF 1983, 1st Ex. Sess., ch. 46, § 75, codified at RCW 75.20.100.

[3] RCW 77.55.021 was amended in 2020 but this amendment has no impact on our analysis, so we cite to the current version. LAWS OF 2020, ch. 10, § 4.

[4] RCW 77.55.011 was amended in 2020 but this amendment has no impact on our analysis, so we cite to the current version. LAWS OF 2020, ch. 10, § 3.

Wildlife is responsible for promulgating rules under the Hydraulic Code, and it has supervisory authority over WDFW. RCW 77.115.010; RCW 77.12.047; *Ferry County v. Concerned Friends of Ferry County*, 155 Wn.2d 824, 828 n.1, 123 P.3d 102 (2005).

Between 1986 and 2005, the legislature added several express exemptions to the Hydraulic Code. The legislature reorganized the exemptions to the Hydraulic Code into consecutive provisions in 2005. LAWS OF 2005, ch. 146 §§ 301-402 (exemptions), § 1001 (specifying order). The Hydraulic Code does not contain an exemption related to aquaculture.

## IV. AQUATIC FARMING ACT

In 1985, the legislature passed the Aquatic Farming Act (Aquatic Act), recognizing aquaculture as a branch of the agricultural industry. LAWS OF 1985, ch. 457, § 1. Where previously many activities conducted by commercial farmers of aquatic products were regulated by Fisheries and Game, the Aquatic Act transferred this regulatory authority to the Department of Agriculture (Agriculture). *See id.* at § 18 (codified as amended at RCW 77.65.010) (removing the requirement to obtain a fishing license for production or harvesting of private sector cultured aquatic products); *see also* LAWS OF 1985, ch. 457, § 20 (codified as amended at RCW 77.65.280) (amending statutes that required aquatic farmers to obtain licenses from Fisheries).

In the portion of the Aquatic Act relating to Fisheries, the Act specified that Fisheries was required to maintain a registration of aquatic farms and to work with Agriculture on a program to control fish disease. LAWS OF 1985, ch. 457, §§ 8-11 (codified at ch. 77.115 RCW). Section 8 of the Aquatic Act, codified at RCW 77.115.010(2) and located in the portion of the Aquatic Act relating to Fisheries, is the primary provision at issue on appeal. RCW 77.115.010(2) provided in pertinent part that,

> The director of fisheries shall adopt rules implementing this section.[5] However, such rules shall have the prior approval of the director of agriculture and shall provide therein that the director of agriculture has provided such approval. . . . The authorities granted the department of fisheries by these rules and by RCW 75.08.080(l)(g), 75.24.080, 75.24.110, 75.28.125, and sections 9, 10, and 11 of this act constitute the only authorities of the department of fisheries to regulate private sector cultured aquatic products and aquatic farmers as defined in section 2 of this act.

LAWS OF 1985, ch. 457, §8 (codified at RCW 77.115.010(2)). The Hydraulic Code is not listed among the statutes over which Fisheries retained authority to regulate aquatic products and farmers under the Act.

The Aquatic Act also added a subsection to former RCW 75.08.080 (2000),[6] stating that Fisheries' rulemaking authority under that statute did not apply to private sector cultured aquatic products, with one exception. LAWS OF 1985, ch. 457, § 17(3) (recodified at RCW 77.12.047(3)); (LAWS OF 2000, ch. 107, § 127). Fisheries retained its rulemaking authority under the statute to require statistical or biological reports from individuals harvesting or processing fish or shellfish. *Id.*

The only explicit reference to the Hydraulic Code in the Aquatic Act was in section 19, codified at RCW 77.65.250. There, the Aquatic Act provided that "[a] mechanical harvester license is required to operate a mechanical or hydraulic device for commercially harvesting clams, other

---

[5] This portion of the statute has since been amended to provide that the Fish and Wildlife Commission shall adopt rules implementing the section. RCW 77.115.010(2).

[6] Former RCW 75.08.080 defined the scope of Fisheries' authority to delineate "the time, place, gear and size, sex, numbers and amounts of various classes of food fish and shellfish that may be taken, possessed, sold, or disposed of." *Nw. Gillnetters Ass'n v. Sandison*, 95 Wn.2d 638, 644-45, 628 P.2d 800 (1981).

than geoduck clams, on a clam farm unless the requirements of [the Hydraulic Code[7]] are fulfilled for the proposed activity." LAWS OF 1985, ch. 457, § 19 (codified at RCW 77.65.250).

## V. THE RELATIONSHIP BETWEEN THE HYDRAULIC CODE AND AQUACULTURE FOLLOWING PASSAGE OF THE AQUATIC ACT

Passage of the Aquatic Act in 1985 did not immediately cease application of Hydraulic Code permitting requirements on aquaculture-related hydraulic projects. For example, in a document prepared by the Washington Sea Grant Marine Advisory Services (MAS) in 1989, MAS described permits and responsible agencies that prospective oyster growers should contact in creating aquaculture farms. MAS recognized that in 1985, the legislature "declared aquaculture to be an agricultural endeavor," and largely transferred responsibility for overseeing aquaculture activities to Agriculture. CP at 1218. However, MAS maintained that among other permit requirements, oyster farmers may require HPA permits for "floating structures such as rafts, or prior to any construction or modification work on or adjacent to a beach." *Id.* at 1219.

In addition, in 1999, WDFW began initial efforts to organize a committee "composed of aquaculturists and others outside of state government that will assist Washington Department of Fish and Wildlife in the development of rules under the Hydraulic Code (RCW 75.20) for aquaculture projects." *Id.* at 539. The rulemaking committee was to gather with the purpose of "brainstorming what type of projects should be included under our hydraulic code authority." *Id.* However, the committee never came to fruition. WDFW determined that the Commission of Fish

---

[7] Referencing former RCW 75.20.100, which was recodified as RCW 77.55.100, LAWS OF 2000, ch. 107 § 129, and later repealed and replaced by the current Hydraulic Code permit statute, RCW 77.55.021. LAWS of 2005, ch. 146 § 1006.

and Wildlife would cease its rulemaking efforts for aquaculture projects under the Hydraulic Code until it determined the extent of its authority to regulate aquaculture.

While WDFW did not move forward with its efforts to create specific Hydraulic Code rules pertaining to aquaculture, it continued to enforce Hydraulic Code permitting requirements for certain activities. For example, in 2000, WDFW required an aquatic farmer to obtain an HPA permit for repair and maintenance of a net pen facility used in fish cultivation.[8] In addition, a Sea Grant article published in 2005, which was reviewed by WDFW prior to publication, stated that HPA permits may be required for clam harvesting "depending on the growing methods to be used." *Id*. at 1240.

## VI. ATTORNEY GENERAL OPINION

In 2006, State Representative Patricia Lantz wrote a letter to the attorney general requesting an opinion as to whether geoduck aquaculture facilities were subject to Hydraulic Code permitting requirements in light of RCW 77.115.010(2) and RCW 77.12.047(3) in the Aquatic Act. Representative Lantz explained her position that based on the plain meaning of the statutes, the broader statutory scheme, as well as several canons of statutory interpretation, the Aquatic Act did not eliminate WDFW's authority to enforce Hydraulic Code permitting requirements on geoduck aquaculture facilities.

The attorney general responded in a 2007 opinion. Citing the language in RCW 77.115.010(2), the attorney general's opinion concluded that this statute presented the entire scope of WDFW's authority to regulate private sector aquatic products, which includes geoducks.

---

[8] We have recognized that net pens fit within the definition of aquaculture. *Echo Bay Cmty. Ass'n v. Dep't of Nat. Res.*, 139 Wn. App. 321, 333-34, 160 P.3d 1083 (2007).

Because the Hydraulic Code statutes are not included within the statutes enumerated under RCW 77.115.010(2), the opinion explained that RCW 77.115.010(2) limits WDFW's authority to enforce Hydraulic Code permitting requirements on aquatic products.

The attorney general opinion further provided that the exemption in RCW 77.115.010(2) should be narrowly construed to restrict WDFW's authority only as to activities that involve both aquatic farmers and aquatic products. Interpreting the statutory language disjunctively as limiting WDFW's authority to regulate any aquatic farmer, the attorney general explained, would lead to absurd results wherein "WDFW could not regulate an aquatic farmer who is hunting because the laws regulating hunting are not on the statutory list." Administrative Record (AR) at 952. In an endnote, the opinion clarified that following this same reasoning "a person who constructs a boat ramp, dock," or who engages in "other construction work at an aquatic farm would require [a Hydraulic Code] permit, because the permit regulates construction; it does not regulate aquaculture products." AR at 957 n.4.

## VII. WDFW'S ADOPTION OF WAC 220-660-040(2)(l)

After the attorney general issued its opinion, WDFW expressed some confusion about its practical effects. Specifically, WDFW found it difficult to distinguish between activities related to aquatic products for which HPA permits were not required and construction activities that took place at aquaculture facilities for which HPA permits were required.

In WAC 220-660-040(2)(l), which became effective on July 1, 2015, the Fish and Wildlife Commission promulgated a rule that expressly exempts the "[i]nstallation or maintenance of tideland and floating private sector commercial fish and shellfish culture facilities" from Hydraulic Code permitting requirements. However, Hydraulic Code permits remain necessary for "accessory

hydraulic structures, such as bulkheads or boat ramps." *Id*. The foundation for the rule, according to the Commission of Fish and Wildlife and WDFW, came from the Aquatic Act provisions discussed above.

## VIII. PROCEDURAL HISTORY

Appellants filed the present action against WDFW, the acting director of WDFW, and PNA, petitioning for declaratory and injunctive relief predicated on their assertion that aquaculture facilities are not exempt from Hydraulic Code permitting requirements. Specifically, Appellants sought declaratory relief under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, establishing that WDFW's practice of declining to enforce Hydraulic Code permitting requirements on aquaculture facilities is "contrary to law." CP at 25. In addition, Appellants claimed that the Fish and Wildlife Commission exceeded its statutory rulemaking authority in promulgating WAC 220-660-040(2)(l) and that PNA should be enjoined from commencing operations of its geoduck aquaculture farm without first obtaining a Hydraulic Code permit.

Taylor Shellfish, a "fifth-generation, family owned," shellfish grower and PNA's business partner, moved to intervene. *Id.* at 107. The superior court granted Taylor's motion and Taylor was added as an additional respondent.

Thereafter, PNA filed a CR 12(c) motion for judgment on the pleadings asking that the superior court dismiss Appellants' claim requesting an injunction against PNA and Taylor. PNA argued that the Hydraulic Code does not, either expressly or impliedly, contain a private right of action. PNA argued that only WDFW may enforce the requirement to obtain an HPA permit. Appellants responded that their claim for injunctive relief arose under the UDJA and that they did not attempt to assert a private right of action under the Hydraulic Code. PNA replied that even if

Appellants' injunction claim was considered under the UDJA, Appellants did not satisfy UDJA requirements for justiciability and their claim should be dismissed on that basis as well. The superior court did not decide the CR 12(c) motion prior to the hearing on the merits.

The case proceeded to a hearing. Several days after the hearing, the superior court entered an order dismissing the case. The order provided in its entirety,

> The unambiguous, plain language of RCW 77.115.010(2) dictates that the Washington State Department of Fish and Wildlife does not have authority to regulate the conduct in question. The prohibition against the regulation of "aquatic products" and "aquatic farmers" necessarily, by definition, prohibits the regulation of the farming of those products by those farmers. This unambiguous, plain language renders further statutory construction inappropriate and renders any other pending motions moot. Accordingly, the Petitioners' claims are DISMISSED.

*Id*. at 1272. Appellants appeal the superior court's order dismissing their claims.

DISCUSSION

I. VALIDITY OF WAC 220-660-040(2)(l)

A. LEGAL PRINCIPLES

1. VALIDITY OF AN AGENCY RULE

Appellants challenge WAC 220-660-040(2)(l), the rule exempting tideland and floating commercial fish and shellfish culture facilities from Hydraulic Code permitting requirements, under the Administrative Procedures Act (APA), Title 34 RCW, arguing that the rule exceeds the Fish and Wildlife Commission's statutory rulemaking authority and that it is therefore invalid under RCW 34.05.570(4)(c)(ii). As the party challenging WAC 220-660-040(2)(l), Appellants bear the burden of demonstrating its invalidity. RCW 34.05.570(1)(a); *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003). Validity of an agency rule is a question

of law that we review de novo. *Ctr. for Envtl. Law and Policy v. Dep't of Ecology*, 196 Wn.2d 17, 28, 468 P.3d 1064 (2020) (*CELP*).

"'The party asserting the invalidity must show compelling reasons why the rule conflicts with the intent and purpose of the legislation.'" *Id.* (quoting *Wash. Fed'n of State Emps. v. Dep't of Gen. Admin.*, 152 Wn. App. 368, 378, 216 P.3d 1061 (2009)). If a given rule is "'reasonably consistent,' with the underlying statute," then the rule should be upheld as valid. *Id.* (internal quotation mark omitted) (quoting *Wash. Fed'n of State Emps.*, 152 Wn. App. at 378). However, a rule or regulation cannot amend a legislative enactment. *Swinomish Indian Tribal Cmty. v. Dep't of Ecology*, 178 Wn.2d 571, 580-81, 311 P.3d 6 (2013). Therefore, "[r]ules that are not consistent with the statutes that they implement are invalid." *Id.* at 581.

2. STATUTORY INTERPRETATION

Because we must determine whether WAC 220-660-040(2)(l) is consistent with the statute it implements, this case involves statutory interpretation. *See Spokane County v. Dep't of Fish and Wildlife*, 192 Wn.2d 453, 457, 430 P.3d 655 (2018). Statutory interpretation is an issue of law subject to de novo review. *Id*.

Our underlying objective in construing a statute is to "determine and effectuate legislative intent." *Swinomish Indian Tribal Cmty.*, 178 Wn.2d at 581. Where a statute is unambiguous, we must give effect to its plain meaning "as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn*, L.L.C., 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

A statute's plain meaning is determined by considering "all that the [l]egislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Id*. at 11. Consequently, "the statutory context, related statutes, and the entire statutory scheme"

are all relevant considerations. *Swinomish Indian Tribal Cmty.*, 178 Wash.2d at 582. Words in a statute are generally examined consistently with their ordinary meaning. *Id*. at 581-82. However, where technical terms and terms of art are used, courts construe them in keeping with their technical meaning. *Id*. In addition, we will avoid interpretations that yield absurd results because we will not presume that the legislature intended such results. *Spokane County*, 192 Wn.2d at 458.

Where a statute's meaning is plain on its face, our inquiry ends. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). But in the event that legislative intent cannot be conclusively determined from a statute's language, its context, and the broader statutory scheme, we will look to legislative history and other aids. *Gronquist v. Dep't of Corr.*, 196 Wn.2d 564, 572, 475 P.3d 497 (2020). The statutes at issue in this case are located in the Hydraulic Code and in the Aquatic Act.

3. THE HYDRAULIC CODE

WDWF has authority to permit and regulate hydraulic projects. RCW 77.55.021; *Spokane County*, 192 Wn.2d at 458. Under the Hydraulic Code, "any person" undertaking a "hydraulic project" must obtain a preconstruction project approval permit from WDFW to ensure that the project is adequately designed to protect fish life. RCW 77.55.021(1).

A "'[h]ydraulic project'" is one that involves "the construction or performance of work that will use, divert, obstruct, or change the natural flow or bed of any of the salt or fresh waters of the state." RCW 77.55.011(11). Projects within the scope of the Hydraulic Code must result in "no net loss" of fish through implementation of a "sequence of mitigation actions." WAC 220-660-080(3)(c). WDFW may not impose conditions that are disproportionate to the potential impact on fish life of the given activity. *Id.*

14

4. THE AQUATIC ACT

As part of the Aquatic Act, Agriculture and WDFW jointly administer a program for aquatic farmers for inspecting and controlling disease in chapter 77.115 RCW. RCW 77.115.010(1). RCW 77.115.010(2) confines WDFW's authority to regulate "private sector cultured aquatic products and aquatic farmers as defined RCW 15.85.020," to a set of statutes that do not include the Hydraulic Code.

"Private sector cultured aquatic products[,]" as defined within RCW 15.85.020(3) are,

> native, nonnative, or hybrids of marine or freshwater plants and animals that are propagated, farmed, or cultivated on aquatic farms under the supervision and management of a private sector aquatic farmer or that are naturally set on aquatic farms which at the time of setting are under the active supervision and management of a private sector aquatic farmer.

An "[a]quatic farmer" is a "private sector person who commercially farms and manages the cultivating of private sector cultured aquatic products on the person's own land or on land in which the person has a present right of possession." RCW 15.85.020(2). "Aquaculture" is defined as "the process of growing, farming, or cultivating private sector cultured aquatic products in marine or fresh waters and includes management by an aquatic farmer." RCW 15.85.020(1).

RCW 77.12.047[9] describes the scope of the state Commission of Fish and Wildlife's as authority to

> adopt, amend, or repeal rules: specifying the times when the taking of wildlife, fish, or shellfish is lawful or unlawful; specifying the areas and waters in which the taking and possession of wildlife, fish, or shellfish is lawful or unlawful; specifying and defining the gear, appliances, or other equipment and methods that may be used to take wildlife, fish, or shellfish; and specifying the times, places, and manner in which the equipment may be used or possessed.

---

[9] RCW 77.12.047 was formerly codified as RCW 75.08.080. LAWS OF 2000, ch. 107 § 127.

*Puget Sound Harvesters Ass'n v. Wash. Dep't of Fish and Wildlife*, 157 Wn. App. 935, 946, 239 P.3d 1140 (2010). Except for rules relating to statistical and biological reports, the Fish and Wildlife Commission does not have authority to adopt, amend, or repeal rules related to private sector cultured aquatic products under this statute. RCW 77.12.047(3). WAC 220-660-040(2)(l), the Hydraulic Code regulation that Appellants challenge as invalid, expressly references RCW 77.12.047 within its text.

B. ANALYSIS

The parties do not dispute that although the Hydraulic Code lists several express exemptions from its requirements, aquaculture is not included as an exemption. Moreover, as recognized in the attorney general opinion, "[t]he work of inserting tubes and netting on the tidelands for geoduck aquaculture would be a hydraulic project because it is 'work' that 'uses' and 'changes' the 'bed of any of the salt or freshwaters of the state.'" AR at 951 (quoting RCW 77.55.011). Consequently, the attorney general opinion explained, and the parties do not dispute, that geoduck aquaculture is a type of activity that would normally necessitate an HPA permit unless an exemption applies. Therefore, the issue before us is whether RCW 77.115.010(2) and RCW 77.12.047(3)[10] provide such an exemption, and whether WAC 220-660-040(2)(l), which exempts Hydraulic Code permitting requirements for aquaculture processes such as those involved in geoduck cultivation, is a valid rule in light of those statutes.

---

[10] Although the superior court did not refer to RCW 77.12.047(3) in its order dismissing the Appellants' claims, validity of an agency's rule is subject to de novo review and we are not bound by the trial court's reasoning. *CELP*, 196 Wn.2d at 28.

1. *PLAIN MEANING*

a. Statutory Language

Appellants contend that because RCW 77.115.010(2) limits WDFW's authority to "license *who* can farm and *what* they can farm" and not its authority to regulate the processes involved in aquaculture farming, the plain language of RCW 77.115.010(2) does not revoke WDFW's authority to require an HPA permit for activities that otherwise fall within the scope of the Hydraulic Code. Br. of Appellants at 26 (emphasis in original). Specifically, Appellants identify the legislature's deliberate use of the terms "'private sector cultured aquatic products'" and "'aquatic farmer[s]'" as defined in RCW 15.85.020, and its avoidance of the term "'aquaculture,'" as evidence that the legislature did not intend to preclude application of the Hydraulic Code to aquaculture processes. *Id.* at 29 (emphasis omitted). The same is true of RCW 77.12.047(3), Appellants argue, because that statute limits the Fish and Wildlife Commission's authority to promulgate rules related to private sector cultured aquatic products but not to aquaculture processes or aquatic farmers.

WDFW responds that the language in RCW 77.115.010(2) reflects clear legislative intent to confine its regulatory authority over aquaculture to the statutes listed therein. While acknowledging that RCW 77.115.010(2) refers to aquatic products and farmers but not the aquaculture process, WDFW contends that it is not possible to regulate "an abstract 'process'" without also regulating the actors who engage in that process. Br. of Resp't WDFW at 12. To support this assertion, WDFW emphasizes that a "person" must apply for a permit and WDFW holds a "person," not a "process" accountable for permit violations. *Id.* WDFW also identifies RCW 77.12.047(3) as the source of its rulemaking authority, and it argues that RCW 77.12.047(3)

expressly prohibits the Fish and Wildlife Commission from promulgating rules that regulate private sector cultured aquatic products.

PNA, for its part, also argues that the plain language of RCW 77.115.010(2) forecloses WDFW's authority to enforce Hydraulic Code requirements on aquaculture processes such as those involved in geoduck cultivation, notwithstanding the statute's omission of the phrase "aquaculture." Br. of Resp't PNA at 13. With respect to RCW 77.12.047(3), PNA responds that RCW 77.115.010(2) must be read in context with RCW 77.12.047(3), and that together, these statutes unambiguously restrain WDFW's authority to regulate the conduct at issue.

To the extent that WDFW and PNA assert that RCW 77.115.010(2) must be read to necessarily limit WDFW's authority with respect to any project an aquatic farmer would undertake within the realm of aquaculture, we disagree with that position. Instead, we hold that although RCW 77.115.010(2) limits WDFW's authority to regulate aquatic farmers and aquatic products, it does not wholly constrict WDFW's authority to enforce the Hydraulic Code for all activities that may occur at an aquaculture facility. In addition, RCW 77.12.047(3) expressly exempts from the Fish and Wildlife Commission's rulemaking authority the ability to adopt, amend, and repeal rules that pertain to methods and materials used in taking private sector cultured aquatic products.

When these statutes are considered in context with one another, their meaning is unambiguous, and the result is that WDFW cannot enforce Hydraulic Code permitting requirements on the geoduck aquaculture processes involved in the instant case. But certain hydraulic projects conducted by an aquatic farmer at an aquaculture facility, such as construction of a bulkhead or boat ramp, still require an HPA permit. Accordingly, WAC 220-660-040(2)(l) is a valid rule.

18

*i. Plain Language of RCW 77.115.010(2)*

Appellants are correct in that the limitation on WDFW's regulatory authority as applied to aquatic farmers and aquatic products in RCW 77.115.010(2) does not necessarily impose an equivalent limit on WDFW's authority to regulate all aquaculture-related processes. It is well established that where the legislature elects to use different terms in the same statute, courts cannot interpret the different terms to have the same meaning. *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 219, 173 P.3d 885 (2007); *see also Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 160, 3 P.3d 741 (2000) ("[W]hen 'different words are used in the same statute, it is presumed that a different meaning was intended to attach to each word.'" (quoting *State ex rel. Pub. Disclosure Comm'n v. Rains*, 87 Wn.2d 626, 634, 555 P.2d 1368 (1976))). In addition, "[i]t is an axiom of statutory interpretation that where a term is defined we will use that definition." *United States v. Hoffman*, 154 Wn.2d 730, 741, 116 P.3d 999 (2005).

Here, RCW 77.115.010(2) directs the reader to RCW 15.85.020 for definitions of the terms "aquatic farmers" and "private sector cultured aquatic products." RCW 15.85.020 also separately defines "aquaculture." These terms must therefore be construed with respect with to their distinct meanings as defined under RCW 15.85.020. *See Densley*, 162 Wn.2d at 219; *Hoffman*, 154 Wn.2d at 741. Equating a limitation on WDFW's authority to regulate aquatic farmers as necessarily extending to any aquaculture processes that an aquatic farmer engages in would obscure the separateness of these terms.

Moreover, we must interpret the legislature's omission of the term "aquaculture" in RCW 77.115.010(2) as intentional. Under the *expressio unius est exclusio alterius* canon of statutory interpretation, "'[w]here a statute specifically designates the things or classes of things upon which

it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature.'" *Magney v. Truc Pham*, 195 Wn.2d 795, 803, 466 P.3d 1077 (2020) (quoting *Wash. Nat. Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County*, 77 Wn.2d 94, 98, 459 P.2d 633 (1969)). Had the legislature intended to limit WDFW's regulatory authority for all processes involved in aquaculture in RCW 77.115.010(2), it would have included that term.

Interpreting RCW 77.115.010(2) as entirely precluding WDFW from exercising any regulatory authority over aquatic farmers except as confined to the enumerated statutes would render WAC 220-660-040(2)(l) invalid. Moreover, such an interpretation lacks a limiting principle, yielding absurd results.

While stating that an HPA is not required for "[i]nstallation or maintenance of tideland and floating private sector commercial fish and shellfish culture facilities," WAC 220-660-040(2)(l) also provides that an "HPA is required to construct accessory hydraulic structures, such as bulkheads or boat ramps." If WDFW lacks authority to regulate aquatic farmers except with respect to the statutes enumerated under RCW 77.115.010(2), WDFW could not enforce Hydraulic Code permitting requirements on aquatic farmers engaged in construction of accessory hydraulic structures. WAC 220-660-040(2)(l) would thus exceed WDFW's statutory authority.

In addition, interpreting RCW 77.115.010(2) as entirely foreclosing WDFW from regulating aquatic farmers would produce absurd results. The attorney general opinion explained that without a limiting principle, "WDFW could not regulate an aquatic farmer who is hunting because the laws regulating hunting are not on the statutory list." AR at 952. As an additional example, WDFW would be unable to require an HPA permit for an aquatic farmer engaged in a

20

hydraulic project on personal property rather than the farmer's aquaculture facility because the Hydraulic Code is not on the statutory list.

To avoid an absurd result, the attorney general opinion states that the limitations to WDFW's regulatory authority in RCW 77.115.010(2) must be read conjunctively as applied to both aquatic farmers and aquatic products, rather than disjunctively. In an endnote, the attorney general opinion expands on this reasoning, stating that therefore, an aquatic farmer who engages in activities such as installation of a boat ramp or a dock would require an HPA permit "because the permit regulates construction; it does not regulate aquaculture products." *Id.* at 957 n.4.

We agree with the attorney general opinion's reasoning that RCW 77.115.010(2) does not broadly constrict WDFW's authority to regulate any activity an aquatic farmer engages in, irrespective of that activity's relationship to private sector cultured aquatic products. It would, therefore, be incorrect to interpret RCW 77.115.010(2) as proscribing WDFW from regulating the geoduck cultivation processes at issue merely because WDFW lacks authority to regulate aquatic farmers *at all* unless one of the enumerated exemptions apply.

Instead, by reading the terms conjunctively, the scope of RCW 77.115.010(2) narrows to limit WDFW's authority to regulate aquatic farmers when their activities relate to aquatic products. In some instances, these activities involve cultivation of aquatic products, such as insertion of PVC pipes and installation of netting on tidelands used in geoduck cultivation. In other instances, the activities do not relate directly to cultivation but may involve marketing, transporting, or labeling aquatic products. Indeed, the Aquatic Act explicitly designated to Agriculture the authority to regulate promotion and marketing of private sector cultured aquatic products. LAWS OF 1985, ch. 457, §§ 3-5 (codified at RCW 15.85.030-.050). The Aquatic Act also removed Fisheries' authority

21

to require commercial licenses for delivery, processing, or wholesaling of private sector cultured aquatic products. *Id.* at § 18 (former RCW 75.28.010 (1998), presently codified at RCW 77.65.010. LAWS OF 2000, ch. 107, § 131).

*ii. Plain Language of RCW 77.12.047*

The validity of WAC 220-660-040(2)(l) is further supported by RCW 77.12.047(3), which is expressly cited within the text of the regulation. Under RCW 77.12.047, the Fish and Wildlife Commission has authority to promulgate rules "[s]pecifying and defining the gear, appliances, or other equipment and methods that may be used to take wildlife, fish, or shellfish, and specifying the times, places, and manner in which the equipment may be used or possessed." RCW 77.12.047(1)(c). The Fish and Wildlife Commission, however, does not have such rulemaking authority as applied to private sector cultured aquatic products. RCW 77.12.047(3).

Appellants' contention that RCW 77.12.047(3) does not prevent WDFW from exercising its authority to enforce the Hydraulic Code on aquaculture processes because the statute pertains only to aquatic products is without merit when the statute is considered in its entirety. RCW 77.12.047 lists 15 areas within the scope of the Fish and Wildlife Commission's rulemaking authority and enumerates two express exemptions. While the Fish and Wildlife Commission has authority to adopt rules regarding, for example, the "gear, appliances, or other equipment and methods that may be used to take wildlife, fish, or shellfish," it does not have authority to do so with regard to private sector cultured aquatic products. RCW 77.12.047(1)(c); *see also* RCW 77.12.047(3).

The express exemption in RCW 77.12.047(3) thus limits the Fish and Wildlife Commission's authority to adopt rules that impose Hydraulic Code permitting requirements

insofar as such rules would regulate "gear, appliances, or other equipment and methods" of taking private sector cultured aquatic products. S*ee* RCW 77.12.047(1)(c). Driving PVC pipes into the substrate and covering the pipes with netting to protect geoducks from predators are examples of materials and methods used to take private sector cultured aquatic products. RCW 77.12.047(3) does not, however, preclude WDFW from requiring aquatic farmers to obtain HPA permits for projects such as construction of bulkheads, boat ramps, or similar, that do not directly involve methods or equipment used in taking private sector cultured aquatic products.

b. Statutory Context

Appellants argue that the context of the Aquatic Act and its broader statutory scheme illustrate further that the legislature did not intend to foreclose application of the Hydraulic Code on aquaculture-related processes. First, Appellants argue that it defies logic to obscure a broad-sweeping exemption to the Hydraulic Code in a statute that establishes a program for disease control, especially because the Aquatic Act otherwise expressly exempted WDFW's authority in other provisions. Second, Appellants assert that because the purpose of the Aquatic Act was to grant aquaculture the same status as other agricultural activities, exempting aquaculture from Hydraulic Code requirements where other agricultural activities remain subject to the Hydraulic Code would negate that purpose.

Third, Appellants claim that in adding a reference to the Hydraulic Code with regard to mechanical clam harvesting in RCW 77.65.250, the legislature demonstrated that it did not intend to revoke WDFW's authority to enforce the Hydraulic Code on all aquaculture activities.

Finally, Appellants contend that because Fisheries and Game were separate entities when the Aquatic Act was passed and the Act provisions at issue only implicated Fisheries' authority to

enforce the Hydraulic Code, interpreting the Act to divest Fisheries of its authority would have the absurd result of allowing Game to continue to enforce the Hydraulic Code until the agencies merged in 1993.

WDFW asserts that the legislature did not obscure a far-reaching exemption within a narrow, unrelated chapter but rather that it deliberately intended to limit WDFW's regulatory authority over aquaculture to disease control. WDFW explains that the legislature's decision to include an express limitation within the disease control chapter is thus consistent with that objective.

Addressing Appellants' claim regarding RCW 77.65.250, WDFW argues that this statute includes products that do not always qualify as private sector cultured aquatic products. Therefore, WDFW contends that the language referring to the Hydraulic Code in RCW 77.65.250 is applicable only to products that do not meet the definition of private sector cultured aquatic products.

PNA, like WDFW, asserts that the Aquatic Act did not obfuscate a broad exemption to the Hydraulic Code but rather that the Act was designed with the express objective of narrowing WDFW's authority over aquaculture. PNA argues that the Aquatic Act does not elevate the aquaculture industry over other agricultural activities because other agricultural industries are also exempt from HPA permitting requirements for activities such as plowing, chemical application, or use of tractors, but not for activities such as construction of culverts or bridges and stream dredging. PNA further contends that the Aquatic Act limited Game's authority with respect to private sector cultured aquatic products in addition to Fisheries' authority, thereby curtailing any potential "absurd" result. Br. of Resp't PNA at 24.

We agree with WDFW and PNA that the statutory context reflects legislative intent to narrow WDFW's regulatory authority over aquaculture under the Hydraulic Code. WAC 220-660-040(2)(l) is therefore a valid rule in that it accurately expresses the scope of WDFW's authority to enforce Hydraulic Code permitting requirements on aquaculture-related hydraulic projects.

First, contrary to Appellants' assertion, the Aquatic Act did not surreptitiously insert a sweeping exemption to the Hydraulic Code by implication within a single sentence in RCW 77.115.010(2). Instead, the Aquatic Act overtly narrowed WDFW's regulatory authority over aquaculture. As discussed above, in RCW 77.115.010(2), the legislature reduced WDFW's authority to regulate aquatic farmers and private sector cultured aquatic products to a list of expressly enumerated statutes, and the Hydraulic Code is not among them. LAWS OF 1985, ch. 457, § 8. In addition, in RCW 77.12.047(3), the legislature exempted cultured aquatic products from Commission of Fish and Wildlife's rulemaking authority that formerly allowed it to adopt rules regulating the times, areas, gear, methods, disposal, possession, etc., of fish and shellfish within the state. *Id.* at § 17. Because the legislature's intent was to narrow WDFW's regulatory authority over aquaculture, this statutory scheme reflects that the legislature elected to expressly define the few areas over which WDFW retained its authority rather than specify the areas in which its authority was constricted.

Second, limitations to WDFW's authority to enforce Hydraulic Code permitting requirements on aquaculture do not elevate aquaculture to a status above other agricultural activity. Under WAC 220-660-040(2)(l), WDFW retains its authority to require aquatic farmers to obtain HPA permits for "accessory" hydraulic structures but not for the activities directly associated with the private sector cultured aquatic products themselves. Department staff have explained that

25

regulating aquaculture in this manner "would bring our regulatory philosophy in line with how we regulate structures on agricultural land. Where we issue HPAs for culverts, bridges, stream dredging, water diversions but do not regulate water use, plowing, chemical application, use of tractors or other equipment, or harvest." CP at 544.

Third, the reference to the Hydraulic Code in RCW 77.65.250 does not demonstrate legislative intent to allow WDFW to continue to enforce Hydraulic Code permitting requirements on aquaculture cultivation processes. RCW 77.65.250 provides that "unless the requirements of [the Hydraulic Code] are fulfilled for the proposed activity," a harvest fishery license is "required to operate a mechanical or hydraulic device for commercially harvesting clams." Mechanical or hydraulic devices are used in harvesting "naturally set" or wild clams and in harvesting cultivated clams. *See Clam Shacks of Am., Inc., v. Skagit County*, 45 Wn. App. 346, 353, 725 P.2d 459 (1986), *aff'd*, 109 Wn.2d 91, 743 P.2d 265 (1987) (describing the use of hydraulic clam rakes to harvest clams without reseeding or culturing the clams).

Clams that are wild or naturally set only qualify as private sector cultured aquatic products if they are also "under the active supervision and management of a private sector aquatic farmer" at the time of setting. RCW 15.85.020(3); *see also State v. Hodgson*, 60 Wn. App. 12, 18, 802 P.2d 129 (1990). Therefore, when mechanical clam harvesting involves private sector cultured aquatic products, WDFW does not have authority to enforce Hydraulic Code permitting requirements on that activity. But for clams that do not meet the definition of private sector cultured aquatic products, RCW 77.65.250 provides that a harvester can obtain an HPA permit in lieu of a harvest fishery license to operate the mechanical or hydraulic harvesting device.

Finally, Game's authority over private sector cultured aquatic products was also restricted in the Aquatic Act, nullifying any concerns over an absurd result in which one of the two agencies retained its authority to enforce the Hydraulic Code on aquaculture. In sections 21-25 of the Aquatic Act, the legislature revised statutes to state that game fish are not private sector cultured aquatic products. LAWS OF 1985, ch. 457, §§ 21-25. In so doing, the Act restricted Game's regulatory authority over aquaculture. *See id.*

The Aquatic Act's purpose was to transition aquaculture into the agricultural realm. *Id.* at § 1. Thus, the Aquatic Act removed much of WDFW's regulatory authority over aquaculture. *See id.* at §§ 17, 18, 20. Restrictions on WDFW's authority to enforce the Hydraulic Code on aquaculture, as provided in RCW 77.115.010(2) and RCW 77.12.047(3) fit within the broader purpose of the Aquatic Act. Accordingly, WAC 220-660-040(2)(l) is a valid rule in that it properly describes the scope of WDFW regulatory authority over aquaculture with respect to the language and context of the Aquatic Act.

2. *LEGISLATIVE ACQUIESCENCE*

Although we hold that meanings of RCW 77.115.010(2) and RCW 77.12.047(3) are unambiguous and we need not employ other interpretive aids, *Lake*, 169 Wn.2d at 526, in this particular instance, it is worth noting that the legislature acquiesced in the attorney general's interpretation of the relevant statutes. "[W]e presume that the legislature is aware of formal opinions issued by the attorney general and a failure to amend the statute in response to the formal opinion may, in appropriate circumstances, be treated as a form of legislative acquiescence in that interpretation." *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 308, 268 P.3d 892 (2011).

Here, in the years after the attorney general opinion was issued, nine bills were submitted to the legislature proposing amendments to RCW 77.115.010. *See* SECOND SUBSTITUTE S.B. 6086, 65th Leg., Reg. Sess. (Wash. 2018); ENGROSSED H.B. 2957, 65th Leg., Reg. Sess. (Wash. 2018); H.B. 2859, 65th Leg., Reg. Sess. (Wash. 2018); H.B. 2260, 65th Leg., Reg. Sess. (Wash. 2018); THIRD SUBSTITUTE H.B. 1118, 64th Leg., Reg. Sess. (Wash. 2016); ENGROSSED SECOND SUBSTITUTE S.B. 5669, 62nd Leg., 1st Spec. Sess. (Wash. 2011); H.B. 1850, 62nd Leg., Reg. Sess. (Wash. 2011); SUBSTITUTE S.B. 5127, 61st Leg., Reg. Sess. (Wash. 2009); and SUBSTITUTE S.B. 6053, 60th Leg., Reg. Sess. (Wash. 2007). None of these bills addressed WDFW's authority to enforce the Hydraulic Code on activities involved in cultivating aquaculture or otherwise attempted to reinstate such authority.

Appellants contend, however, that because the legislature passed a bill, sponsored by Representative Lantz, which called for a study pertaining to the environmental effects of shellfish aquaculture after the attorney general opinion issued, the legislature indicated its objection to the attorney general opinion's interpretation of the relevant statutes. H.B. REP. ON SECOND SUBSTITUTE H.B. 2220, 60th Leg., Reg. Sess. (Wash. 2007). Appellants rely on *Five Corners*, where the court held that the legislature did not acquiesce in an attorney general opinion's interpretation of a statute when it "subsequently established a working group to review the issue." 173 Wn.2d at 309.

*Five Corners* is inapposite because in that case, the working group was convened to contend directly with the attorney general opinion's resolution of an issue. *Id*. Here, in the request letter submitted to the office of the attorney general, Representative Lantz specifically stated that she "[did] not expect [the opinion] to draw any conclusions as to the impact of [geoduck

28

aquaculture] practices on fish life." CP at 533. Approval of a bill to study the environmental impacts of shellfish aquaculture subsequent to the issuance of the attorney general opinion, therefore, does not evince disagreement with the opinion's conclusion that the Aquatic Act restrained WDFW's authority to enforce Hydraulic Code Permitting requirements on Aquaculture.

Moreover, while the house bill report references the Shoreline Management Act, ch. 90.58 RCW[11] and the Department of Natural Resources' responsibility to manage aquatic lands, the bill report makes no reference to either the Hydraulic Code or to the Aquatic Act. The lack of reference to either the Hydraulic Code or the Aquatic Act is telling in it shows that after the attorney general opinion issued, the legislature focused on the Shoreline Management Act and the Department of Ecology's authority under that Act as a means of advancing environmental protection for activities related to shellfish aquaculture. It does not indicate the legislature's opposition to the opinion's conclusion that WDFW lacks authority to enforce the Hydraulic Code on geoduck cultivation processes.

Taken together, the above discussion of the plain language of the relevant statutes and the broader context of the statues reflect that WDFW lacks authority to enforce Hydraulic Code permitting requirements on aquatic farmers when they engage in activities related to private sector cultured aquatic products under RCW 77.115.010(2). The limitation to WDFW's authority to regulate private sector cultured aquatic products is further established by the restrictions on the Commission of Fish and Wildlife's rulemaking authority in RCW 77.12.047(3). WAC 220-660-

---

[11] The Shoreline Management Act requires an individual to obtain a permit prior to undertaking any "substantial development" on a Washington shoreline. RCW 90.58.140(2). The Act is "broadly construe[d] . . . to protect the state shorelines as fully as possible." *Herman v. Shorelines Hr'gs Bd.*, 149 Wn. App. 444, 459, 204 P.3d 928 (2009).

040(2)(l) is thus a valid rule in that it properly carves out the extent of WDFW's authority to enforce Hydraulic Code permitting requirements on the geoduck cultivation processes at issue here. Accordingly, the trial court properly dismissed Appellants' claims arising under the APA.

## II. INJUNCTIVE RELIEF

Appellants argue that because Hydraulic Code permitting requirements apply to the geoduck cultivation practices that PNA and Taylor intend to engage in, Appellants are entitled to injunctive relief preventing PNA and Taylor from further action on their geoduck aquaculture facility until they obtain a Hydraulic Code permit pursuant to the UDJA, ch. 7.24 RCW.

We decline to reach this issue because, consistent with the above analysis, Hydraulic Code permitting requirements do not apply to the challenged geoduck cultivation practices that include installation of PVC pipes and application of netting to tidelands. Moreover, there is no evidence that PNA or Taylor intend to construct an "accessory hydraulic structure[ ]" within the meaning of WAC 220-660-040(2)(l). Therefore, there are no grounds for issuing injunctive relief as requested by Appellants.

## III. ATTORNEY FEES

Appellants request attorney fees under the Equal Access to Justice Act (EAJA), RCW 4.84.350(1). Through the EAJA, a qualified prevailing party is entitled to up to $25,000 in attorney fees for each level of review. RCW 4.84.350(2). But because Appellants do not prevail in this appeal, we hold that they are not entitled to an attorney fee award under RCW 4.84.350(1).

## CONCLUSION

We hold that because the Aquatic Act limited WDFW's authority to enforce Hydraulic Code permitting requirements on activities directly associated with aquaculture cultivation of

private sector cultured aquatic projects, WAC 220-660-040(2)(l) is a valid rule properly within the scope of the Commission of Fish and Wildlife's statutory rulemaking authority. As a result, we decline to reach the merits of the Appellants' claim for injunctive relief because under WAC 220-660-040(2)(l), Hydraulic Code permit requirements do not apply to the activities PNA intends to engage in on its aquaculture facility.

Accordingly, we affirm.

CRUSER, J.

We concur:

WORSWICK, P.J.

SUTTON, J.